## CENTRAL NATIONAL BANK *v.* STEVENS.

ERROR TO THE COURT OF APPEALS OF THE STATE OF NEW YORK.

No. 88.   Argued October 15, 1897. — Decided March 7, 1898.

In August, 1880, Sackett brought suit in the Supreme Court of the State of New York, on behalf of himself and all other holders and owners of bonds of certain railroad companies against Root, the Harlem Extension Railroad South Coal Transportation Company, the New York, Boston and Montreal Railway Company and David Butterfield, receiver of said company, praying for the appointment of a receiver and for a sale of the railroad and franchises for the benefit of the bondholders.   On October 11, 1880, a receiver was appointed and qualified.   On April 2, 1881, on petition of the receiver, and after a report by an expert disclosing the necessity for expenditure to make the road safe and to enable trains to be run, an order was made by the court authorizing the receiver to issue and negotiate $350,000 in certificates, the same to be a first lien.   The certificates were sold, and the proceeds expended under the approval of the court. On June 12, 1885, sale was made of the road and deed delivered to Foster and Hazard for $155,000, subject to the payment of the unpaid portion of the principal and interest of the certificates.   On April 9, 1886, the Central National Bank of Boston brought suit in the Supreme Court of New York, on its own behalf and that of others as owners of the certificates, against Foster, Hazard, the New York, Rutland and Montreal Railway Company, and the American Loan and Trust Company.   On March 24, 1887, the suit having been transferred on the petition of the defendants to the Circuit Court of the United States, after full hearing and argument the latter court rendered a final decree, establishing the rights of the Central National Bank of Boston and of others as owners of said certificates, declaring the latter to be a first lien, decreeing that Foster and Hazard were liable for any deficiency if the sale should fail to realize enough to

pay certificates.  On March 23, 1892, sale under said decree to Foster for $7500, and on April 25, 1892, deed of conveyance by referee to Foster, were made.  On December 8, 1890, Stevens and others brought their suit in the Supreme Court of New York against the Central National Bank of Boston, the other holders of certificates, Foster, Hazard and others, to set aside the decree in Sackett's case and to enjoin proceedings in the Circuit Court of the United States.  November 11, 1891, judgment setting aside the sale in Sackett's case and finally enjoining the Central National Bank and others, plaintiffs in the Circuit Court of the United States, from selling under the decree of the Federal court.  On May 16, 1892, sale and conveyance were made by referee under the decree in the present suit to Foster.  On May 9, 1893, judgment of the general term was rendered, and November 27, 1894, judgment of the Court of Appeals, each affirming the judgment of the Supreme Court, *Held* that the judgment of the Supreme Court of New York and of the Court of Appeals affirming the same are erroneous in so far as they command the Central National Bank of Boston, the Massachusetts Mutual Life Insurance Company and other holders of the receiver's certificates whose rights, as such holders, were adjudged by the Circuit Court of the United States, to appear before the referee appointed by the Supreme Court in the present case, and which enjoin the Central National Bank of Boston and others, whose rights have been adjudged by the Circuit Court of the United States for the Northern District of New York, from proceeding with the sale under the decree of that Court.

THE Lebanon Springs Railroad Company was organized in the year 1852, and, by virtue of various acts of the legislatures of New York and Vermont, was authorized to construct and maintain a railroad extending from Chatham, New York, to Bennington, Vermont.  On the 1st day of July, 1867, the said company duly executed and delivered to the Union Trust Company of New York a mortgage of that date on all its property, rights and franchises, to secure the payment of bonds to the amount of two million of dollars, which bonds were then or soon after sold to a great number of persons.  In January, 1870, the Lebanon Springs Railroad Company consolidated with the Bennington and Rutland Railroad Company, under the name and style of the Harlem Extension Railroad Company.  The new company, on April 1, 1870, executed and delivered to the said Union Trust Company a mortgage on its road and franchises to secure bonds to the amount of four million dollars. Of these bonds there were sold to outside parties to the amount of one million five hundred thousand dollars.  The

remaining two million five hundred thousand dollars of bonds were reserved to take up and be exchanged for the two million dollars of bonds of the Lebanon Springs Railroad Company and for five hundred thousand dollars of bonds which had been issued by the Bennington and Rutland Railroad Company, but such exchange never took place, and accordingly only one million five hundred thousand dollars of the said bonds of the Harlem Extension Railroad Company were ever issued. Both said mortgages were duly recorded in the proper counties in the States of New York and Vermont.

On February 22, 1872, the interest upon the said bonds of the Lebanon Springs Railroad Company falling due after January, 1869 not having been paid, the Union Trust Company of New York began an action in the Supreme Court of New York to foreclose the mortgage of that company, in which action the Lebanon Springs Railroad Company and the Harlem Extension Railroad Company were made defendants.

On November 15, 1872, the Union Trust Company of New York filed bills in the Court of Chancery in the State of Vermont to foreclose both of said mortgages, in which actions the Lebanon Springs Railroad Company and the Harlem Extension Railroad Company were made defendants, and said defendants duly appeared in that court prior to December 1, 1872.

While the above-mentioned actions were pending, and on December 18, 1872, the Harlem Extension Railroad Company and the Pine Plains and Albany Railroad Company, a corporation of the State of New York, consolidated their roads, property and capital stock, under the name of the Harlem Extension Railroad Company; and on December 19, 1872, the New York, Boston and Northern Railroad Company and the said last named the Harlem Extension Railroad Company duly consolidated their roads, property and capital stock, and thus formed one company under the name of the New York, Boston and Montreal Railway Company.

The above-mentioned foreclosure suits were so proceeded with that, in the said action in the Supreme Court of New York, a judgment of foreclosure of the said mortgage given by the Lebanon Springs Railroad Company, and for a sale of

its road, property and franchises within the State of New York, and of all its right, title and interest to the railroad and franchises within the State of Vermont, was rendered on December 10, 1872; and on January 25, 1873, the property and franchises mentioned were sold to one William Butler Duncan for the price of one hundred thousand dollars, and on said day, Charles S. Fairchild, the referee appointed by the court to effect the sale, executed and delivered to one James C. Hull his deed of conveyance of the said road, property and franchises, bearing date the said 25th January, 1873, and said deed was duly recorded in the clerks' offices for the counties of Rensselaer and Columbia.

On the 7th day of December, 1872, decrees of foreclosure of the mortgage of the Lebanon Springs Railroad Company and of the Harlem Extension Railroad Company's mortgage, and directing a sale, were rendered; and in pursuance of such decrees the said road, property and franchises within the State of Vermont were, by Daniel McEwen, a special master in chancery, appointed by the court for that purpose, sold on January 20, 1873, to one Charles G. Lincoln, for the sum of fifty thousand dollars, and deeds of conveyance of that date were made and delivered to said Lincoln by the said master in chancery.

On January 28, 1873, Hull and Lincoln, the respective purchasers at the said foreclosure sales, executed and delivered to the said William Butler Duncan and to one Trenor W. Park a bond in the sum of five million dollars, and a mortgage to secure the same on all the roads, property and franchises of the Harlem Extension Railroad Company, including those of the Lebanon Springs Railroad Company and of the New York and Vermont Railroad Company.

On January 30, 1873, Hull and wife, by their deed executed and delivered that day, conveyed all said roads, property and franchises, situated in the State of New York, to the said the New York, Boston and Montreal Railway Company, subject, however, to said mortgage to Duncan and Park; and, on the same day, Lincoln, by a deed executed and delivered by him, conveyed said roads, property and franchises, situated in the

State of Vermont, to the said the New York, Boston and Montreal Railway Company, subject to the said mortgage to Duncan and Park, and to the said five hundred thousand dollar mortgage on the old Bennington and Rutland Railroad.

The New York, Boston and Montreal Railway Company paid the sum of $807,077.05 on account of the moneys due on said bond and mortgage, which had become wholly due and payable on or before February 1, 1875, but has never paid the remainder of the money due on said bond and mortgage.

On March 15, 1873, the New York, Boston and Montreal Railway Company executed and delivered a certain other mortgage in the amount of twelve million two hundred and fifty thousand dollars to Seligman, Sherman and Brown as trustees. This mortgage covered the above-mentioned railroad and other properties. On the 1st day of April, 1873, the New York, Boston and Montreal Railway Company executed and delivered still another mortgage on the said railroad and other things in the amount of twelve million seven hundred and fifty thousand dollars, in which the New York Loan and Indemnity Company was named as trustee. Enough of the bonds of the said last two mortgages were sold to realize six millions of dollars, which were received and disbursed by Seligman and Brown. The said railroad was operated by and on behalf of the New York, Boston and Montreal Railway Company until some time in November, 1873, when said company leased the road to the Central Vermont Railroad Company, by which it was operated until August 20, 1877, when said last-mentioned company withdrew from the possession of and abandoned the road. In the meantime the New York, Boston and Montreal Railway Company had failed to fulfil its obligations and had become wholly insolvent, and said railroad, when surrendered and abandoned by its lessee, lay unoccupied and unoperated until some time in September, 1877, when it was taken possession of by one Russell C. Root, who subsequently, in November, 1877, delivered possession thereof to a corporation called the Harlem Extension Railroad South Coal Transportation Company, a corporation of the State of New York, and of which said Root was president,

and which continued to operate said railroad until it came into the possession of John W. Van Valkenburgh as hereinafter stated.

On September 7, 1889, one Marvin Sackett, claiming to be the owner of bonds to the amount of $8700, issued, as before mentioned, by the Lebanon Springs Railroad Company, brought an action in the Supreme Court of New York against the said Russell C. Root, the Harlem Extension Railroad South Coal Transportation Company, the New York, Boston and Montreal Railway Company and Daniel Butterfield, as receiver of the said last-mentioned company, praying for the sale of the whole of the said railroad property and franchises.      He claimed to bring the action in behalf of himself and all others, bondholders of the Lebanon Springs Railroad Company, similarly situated, who held any of the two million of dollars of the bonds of said company. He alleged in his complaint the fact of the mortgage, to secure his bonds, among others, to the Union Trust Company of New York, its actions to foreclose the sales under them, the aforesaid sales to Hull and Lincoln, and their mortgage to Park and Duncan, and the conveyance by the latter to the New York, Boston and Montreal Railway Company, and that Hull and Lincoln, and Park and Duncan, acted throughout all those matters as the agents and representatives, and for the use and benefit of the bondholders of the Lebanon Springs Railroad Company.

The summons and complaints were served upon the New York, Boston and Montreal Railway Company and upon Butterfield as receiver, but they did not appear. Russell C. Root and the Harlem Extension Railroad South Coal Transportation Company were also served, and they put in joint answers on September 25, 1880. On October 1, 1880, the complainant Sackett moved for the appointment of a receiver, and on October 7, John W. Van Valkenburgh was appointed and filed his bond as receiver.

On November 12, 1880, one Bloodgood and six others, claiming to own a majority of the bonds of the Lebanon Springs Railroad Company, moved for leave to be made

parties to the action.   This motion was, on January 10, 1881, denied, but the plaintiff was directed to serve papers and notices of every kind on one F. L. Westbrook, who was by the order authorized to appear as counsel of the said Blood-good and the other six bondholders, upon all trials, hearings and motions.   On November 6, 1880, Park and Duncan made an application to the court to be made parties to the action, alleging that they were the owners of over \$300,000 of bonds of the Lebanon Springs Railroad Company, and of over \$600,000 of bonds of the Harlem Extension Railroad Company, and that they were the mortgagees under the mortgage made by Hull and Lincoln.   This application was not granted. One Henry A. Tilden, who claimed to own thirty of the bonds of the Lebanon Springs Railroad Company, was associated with Sackett in the bringing of said action, and appeared by counsel.   On October 11, 1880, the receiver filed a petition, setting forth that he had no funds with which to equip or operate the road, and asking that he might be allowed to. borrow \$25,000 on certificates for that purpose, and on October 25, 1880, the court made an order authorizing the receiver to borrow \$25,000 on certificates, which were declared to be a first lien on the net profits of the railroad company.   On February 23, 1881, the receiver filed a petition setting forth that there were large arrears of taxes, for which sales had taken place of portions of the road, that there was a necessity for the purchase of rails and superstructures, and praying that he might be authorized to issue certificates to raise the necessary moneys to redeem such portions of the road as has been sold for taxes, and to purchase rails and make other necessary repairs.   Notice of this petition was filed on Hamilton Ward, attorney general of the State of New York; on McClellan and Brown, attorneys for Sackett, the plaintiff; on P. W. Ostremder, attorney for R. C. Root, defendant, and on F. W. Westbrook, attorney designated to receive notices on behalf of Bloodgood and others.

On March 5, 1881, the court, after hearing Edward New-comb, of counsel for said receiver, and F. L. Westbrook, of counsel in opposition thereto, appointed James H. Jones, an

expert, to examine the rails, ties, bridges, roadbed, trestles, telegraph poles and all matters pertaining to the running of the Lebanon Springs Railroad, to the end that he should make a report to the court of the true condition of the Lebanon Springs Railroad, with his opinion thereon as to what was necessary and requisite for the protection of said property and the safety and successful running of said railroad; that said report be made to said receiver, and that said receiver should return said report, together with a detailed statement of moneys received and expended by him, with such other information as he should have in relation to said railroad; and further directing that said reports and papers should be served on F. L. Westbrook ten days prior to the hearing on said report before the court.

On March 19, 1881, James H. Jones made an elaborate report to the receiver, stating that he had, in pursuance of his appointment, made a careful examination of the said railroad, its rails, ties, bridges, roadbed, trestles, telegraph poles and all matters appertaining to the running and management thereof; that he found the rails of iron worn to such an extent as to render the running of trains, even at an ordinary rate of speed, extremely dangerous; that to render the track safe for ordinary use would require from 2500 to 3000 tons of new rails to replace the poorer conditioned of the old ones; that the ties were badly decayed, to replace which would require about 87,000 new ties; that the road required new ballasting; that the bridges and trestles were in an unsafe condition, all needing repair; that to repair the bridges and trestles and abutments would require an expenditure of some $19,000; that new telegraph poles to the number of 2030 were required; that, in fine, to put said road in a condition to render its operation safe and successful would require about $320,000. This report was returned to court by the receiver, with a statement of his receipts and expenditures to date, and on April 4, 1881, the court, after considering said reports and hearing counsel for the receiver, and no one appearing in opposition thereto, ordered the receiver to put said road in repair as recommended by the report of James H. Jones, and

authorized him to issue receiver's certificates, dated April 2, 1881, with interest at six per cent, for the aggregate amount of $350,000, the same to be signed by said John W. Van Valkenburgh, as receiver of said Lebanon Springs Railroad Company, and a certificate on each thereof duly to be signed by an officer of the Farmers' Loan and Trust Company of New York City. It was further ordered that the said receiver should negotiate said certificates, and with the money arising therefrom pay and discharge the $25,000 of certificates theretofore authorized by the order of October 25, 1880, and to purchase all necessary materials for the repairs of said road, and pay and discharge all necessary expenses incident to said repairs. It was further ordered that said receiver's certificates of indebtedness should be declared to be a debt of the receiver incurred for the benefit and protection of said Lebanon Springs Railroad and its owners and the bondholders thereof, and said certificates were declared and decreed to be a first lien on the railroad and every kind of property owned by the company, to be recognized as such in any reorganization of the company or in its consolidation with any other company ; and in case of any sale of the said railroad, the property in the hands of the receiver, and the franchises, under any decree of the Supreme Court, the said certificates are to be first paid from the first moneys realized thereupon by the receiver, unless sooner paid and cancelled by him from the earnings of the railroad; but in case said railroad and property in the hands of the receiver and franchises, on any sale thereof, does not bring sufficient to pay the full amount and interest then due on the outstanding negotiated certificates, then such unpaid amount shall remain as a first lien on the road, property and franchises in the hands of the purchaser.

On January 12, 1885, a final decree of sale was made, appointing George McClellan as referee to make such sale, and providing, among other things, that sale should be made subject to the payment of the undue principal and interest of the receiver's certificates, and that the purchaser of the railroad and franchises should take said railroad, property and franchises, subject to the unpaid portion of said certificates,

which should be assumed by such purchaser as part of the consideration of the purchase.

On June 29, 1885, George McClellan, the referee, reported to the court that he had effected sale, in accordance with the terms of the decree of sale, to one William Foster, Jr., trustee, for the sum of $155,000, and that, among the terms of the sale, it was stipulated that William Foster, Jr., trustee, should take the property and assets, subject to the payment of the undue principal and interest of the receiver's certificates.

Subsequently, the referee executed and delivered to William Foster, Jr., and Rowland N. Hazard, as purchasers, a deed of conveyance, and received from them $155,000, the amount of their bid ; and it appears that, out of the amount of said purchase money, there was then paid about $60,000, the interest then due on said certificates. Afterwards, it appears by the record, that Foster and Hazard conveyed the railroad, property and franchises to the New York, Rutland and Montreal Railway Company, to which company Reynolds, who had succeeded Van Valkenburgh as receiver, surrendered possession of the railroad. The balance of the purchase money was used and applied as directed by the judgment in the said Sackett suit.

The principal of said certificates became due on the 1st day of April, 1886, and was not paid. Thereupon, in the month of April, 1866, the Central National Bank of Boston brought an action in the Supreme Court of New York in behalf of itself as well as other holders of receiver's certificates, against William Foster, Jr., Rowland N. Hazard, the New York, Rutland and Montreal Railway Company and the American Loan and Trust Company of New York. All of the defendants in said action appeared and answered. After issue was joined, the said action was, on the petition of the defendants, duly removed into the Circuit Court of the United States for the Northern District of New York.

The complaint alleged in substance that the plaintiff is a banking association duly organized and incorporated under the laws of the United States, located and doing business in the city of Boston, in the Commonwealth of Massachusetts.

It alleged the making of an order on or about April 2, 1881, by the New York Supreme Court in the Sackett suit, whereby one John W. Van Valkenburgh, as receiver of the Lebanon Springs Railroad Company, was authorized and directed to issue under his hand receiver's certificates of indebtedness, dated April 2, 1881, with interest at six per cent, of $500 each, payable in five years, interest payable January 1 and July 1 in each year, to the aggregate amount of $350,000, such certificates and the interest coupons thereto attached made payable at the Farmers' Loan and Trust Company in the city of New York, and whereby it was further ordered that the receiver negotiate said certificates to the amount aforesaid, and with the moneys arising thereupon pay and discharge certain previous certificates theretofore authorized by an order of the same court, and from the moneys arising from said certificates, that said receiver purchase all necessary materials for the repairs of said railroad, and to pay and discharge all necessary expenses incident to the repairs thereof, and all other expenses attending the running and successful managing and operating of said railroad, together with such indebtedness as might be found due to claimants by the referee named in said order; that it was further provided in said order that the said receiver's certificates of indebtedness to the amount therein directed to be issued, be and the same were thereby declared to be a debt of the said receiver, incurred for the benefit and protection of the said Lebanon Springs Railroad and its owners and bondholders, and said certificates to the amount of $350,000 were by said order declared to be a first lien on the railroad and all and every kind of property owned by said railroad company or in the possession of the receiver thereof, and that said certificates were to be recognized as such in any reorganization of the company, and that in case of any sale of the railroad, the property in the hands of the receiver, and franchises under any decree of the Supreme Court, said certificates were to be first paid from the first moneys realized therefrom by said receiver, unless sooner paid and cancelled by him from the earnings of said railroad. It was further provided in said order that in case said railroad property in the hands of

the receiver and franchises on any sale thereof should not bring sufficient to pay the full amount of principal and interest then due on the outstanding negotiated certificates in said order authorized to be issued, then the purchaser of said railroad and the property in the hands of the receiver, and franchises, should assume, as a first lien thereon, so much of said principal as at that time should remain outstanding and unpaid with interest thereon, referring to the original order or the record thereof.

The complaint further alleged that the said Van Valkenburgh, as receiver, under and in pursuance of said order, did issue and negotiate such certificates of indebtedness in the manner and form by said order provided to the amount of $350,000, and that he duly applied the moneys received .from said certificates to the uses and purposes mentioned and in said order authorized ; that the plaintiff is now and has for several years last past been the owner and holder of said certificates, amounting in the aggregate to $250,000 of principal thereof, and that the certificates issued and negotiated by the receiver which are not held by plaintiff, are held by divers persons and corporations, many of whose names are unknown to the plaintiff.

The complaint further alleged that in the said Sackett suit the plaintiff appeared by its attorneys on the trial of the issues and made proof in regard to the issuing of said certificates and its title thereto, and that such proceedings were had therein that a judgment was rendered on or about January 12, 1885, by which it was, among other things, adjudged and decreed that the said certificates, amounting in the aggregate to $350,000, were ratified and cónfirmed and declared to be a first lien on the railroad and its property, as provided in the said order, for the amount of principal and interest unpaid thereon, subject to the payment of certain costs and expenses in said judgment provided for, and whereby it was further adjudged and decreed that the property, franchises and rights of the said railroad company as described in a certain mortgage therein referred to, and in the judgment in said Sackett suit, and all the right, title and interest of any and of

all the parties to the said action, including all property and assets in the hands of said receiver, be sold at public auction under the direction of a referee therein named, for the benefit of the first mortgage bondholders of said railroad company issued July 1, 1867, for the amount of $2,000,000, and that said sale be made subject to the payment of the undue principal and interest of the said receiver's certificates, and that the purchaser or purchasers of said railroad property and franchises should take the said railroad property and franchises subject to the unpaid principal and interest on the said receiver's certificates, and should assume, as part of the consideration of the purchase, the payment thereof, and from the avails of said sale, after the payment of certain expenses therein provided for, the said referee should pay the amount of interest due on said receiver's certificates; that under and in pursuance of said judgment, the referee named therein did advertise for sale on the 12th day of June, 1885, and did sell at public auction, the premises, rights, franchises and property in said judgment mentioned and described, to the defendants, William Foster, Jr., and Rowland N. Hazard, who became the purchasers thereof for the price of $155,000, and that the said William Foster, Jr., acting on behalf of himself and said Hazard, did pay the referee five per cent of the purchase price and did subscribe a certain contract of sale, which was also subscribed by said referee, whereby, among other things, he did, for himself and said Hazard, assume and agree to pay the amount of said principal and interest on said certificates of indebtedness as part of the consideration of said purchase; that the balance of said $155,000 was thereafter paid by the purchasers to the referee, and that the referee did thereafter duly execute and deliver to the defendants Foster and Hazard a deed of said premises and property in said judgment described, and paid from the said $155,000 the interest then due on said certificates, amounting to about $60,000.

Plaintiff further alleged in said complaint that said referee's deed was duly accepted by the defendants Foster and Hazard, and that in and by the deed, the grantees therein, the defendants Hazard and Foster, took said premises and property

subject to the unpaid principal and interest on the receiver's certificates, as required by the judgment aforesaid; that the principal of said certificates with interest from January 1, 1886, became due and payable on the 2d day of April, 1886, and that on that day the said certificates, amounting to $250,000, held by the plaintiff, were duly presented to the Farmers' Loan and Trust Company of the city of New York, where the same were payable, and payment thereof was demanded, but the same was refused, and that the whole of said principal with interest from the 1st day of January, 1886, is now due and unpaid. The complaint then gives a description of the railroad premises mentioned in the judgment in the Sackett suit and in the referee's deed; alleges that the defendants or some of them are now in possession of the property above described, and are using and operating the same for railroad purposes, and that all the defendants have or claim to have some interest in or lien upon said premises or some part thereof, which interest or lien, if any, has accrued subsequently to the lien of said certificates, and that there is now justly due the plaintiff upon said certificates held by it the sum of $250,000, with interest from January 1, 1886.

The complaint then prays that the unpaid principal and interest of said receiver's certificates may be adjudged to be a lien upon said premises; asks for the usual judgment of foreclosure, for a receiver and for a sale, and that out of the moneys arising from the sale of said premises, plaintiff and other holders of said certificates who may come in and prove their title thereto and the amount due thereon may be paid the amount due on said certificates with interest and costs, so far as the amount of such moneys properly applicable thereto will pay the same, and that the defendants Hazard and Foster may be adjudged to pay any deficiency that may remain after applying said moneys so applicable thereto, and for general relief.

The defendants all appeared and answered. Hazard and Foster answered separately, admitting their purchase substantially as alleged in the complaint, controverting some of the other allegations, and setting up as a distinct defence that

they acquired the property mentioned in the plaintiff's complaint with notice that the receiver's certificates were outstanding and of the sum justly due therefor, and that they have ever since been and now are ready and willing to pay the sum justly due on account of said receiver's certificates, but that they are advised and believe that the plaintiff is not. entitled to receive payment thereof; that when the said property came into the hands of these defendants, it was subject to a lien for the amount actually due from the receiver and his successor in the trust for the amount of said receiver's certificates, but for no other or greater amount; and that these defendants when they acquired the property succeeded to all the rights of the prior owners of the property as well as to their obligations; that in accepting the deed of the premises, they intended only to obligate themselves to pay the amount actually due from the receiver on account of such certificates, with proper interest, and no other or greater sum by way of profit, and defendants aver that they incurred no greater or other obligations in the premises.

The defendant the New York, Rutland and Montreal Railway Company also put in a separate answer. It alleged, among other things, that defendants Foster and Hazard had conveyed and transferred to it all the property and franchises conveyed to them by the referee in the Sackett suit subject to the payment of the sum justly due by said receiver, but not subject to any greater sum, and it controverts the allegations as to the amounts due on the receiver's certificates.

The American Loan and Trust Company also answered separately, setting up that it was the holder of a mortgage executed to it by the New York, Rutland and Montreal Railway Company, and denying knowledge or information as to the matters charged in the bill.

The case came on for a hearing on pleadings and proofs, and after full argument, on March 24, 1887, a decree was passed of which the following is a copy (omitting the description of the property, which is the same as that contained in the complaint in *this* action):

" It was ordered, adjudged and decreed as follows:

"That the certificates of indebtedness issued by John W. Van Valkenburgh, as receiver of the Lebanon Springs Railroad Company, under and in pursuance of an order of the Supreme Court of the State of New York, bearing date the 2d day of April, 1881, made in an action in said Supreme Court, wherein one Marvin Sackett was plaintiff, and Russell C. Root and others were defendants, amounting in the aggregate to $350,000, are a lien upon the premises and property described in the bill of complaint herein, in the hands of the defendants herein, and of any persons claiming through or under the defendants Rowland N. Hazard and William Foster, Jr., the purchasers of said premises and property, at a sale thereof made under and in pursuance of the judgment rendered in said action in said Supreme Court on or about the 12th day of January, 1885; and that the complainant, the Central National Bank of Boston, is the holder and owner of certain of said certificates, amounting in the aggregate to $250,000 of principal thereof, upon which there is now due and unpaid to the complainant the said sum of $250,000, with interest at the rate of six per cent per annum thereon from the first day of January, 1886.

"That it be referred to William Lansing, Esq., of the city of Albany, who is hereby appointed a master *pro hac vice* in this cause to examine, ascertain and report who are the holders other than the complainant of said certificates of indebtedness, and how much remains due and unpaid thereon. And the said master is hereby authorized and directed to give notice by advertising in two daily newspapers, published in the city of Albany in said district, requiring the holders of said certificates to produce the same before the said master at his office in the city of Albany, at such time as he shall designate (which shall be at least twenty days after the first publication of said notice), and make proof as to their title thereto, and the amount due thereon; and the said master is also authorized and directed to inquire, ascertain and report what would be the just proportion and amount for the said other holders of said certificates to contribute to the expenses of this suit.

"That the premises and property described in the bill of complaint in this cause, as hereinafter set forth, or such part

thereof as is sufficient to satisfy the amount due and unpaid on said certificates, and expenses of sale and the costs of this suit, and which may be sold separately without material injury to the parties interested, be sold at public auction in the county of Rensselaer, in said district, by or under the direction of Worthington Frothingham, Esq., who is hereby appointed a referee for said purpose ; that the said referee give public notice of the time and place of such sale according to law and the practice of this court; that the complainant or any other party to this suit may become a purchaser on such sale ; that the said referee execute to the purchaser or purchasers a deed or deeds of the premises and property sold ; that out of the moneys arising from such sale, after deducting the amount of his fees and expenses on such sale, the said referee pay to the complainant or its solicitors the amount of its costs and disbursements to be taxed herein ; that he also pay to the complainant or its solicitors the amount due to it on said certificates as aforesaid, together with the interest thereon from the 1st day of January, 1886 ; and that he pay to the holders of the other said certificates respectively the amount of principal and interest due thereon, as the same may be found and reported by the said master as aforesaid ; but if the moneys arising from such sale, after the payment of said costs and expenses as aforesaid, shall not be sufficient to pay the said certificates with interest in full, then that the said referee pay and distribute the said moneys, after the payment of the fees, expenses, costs and disbursements above mentioned, to the said certificate holders, including the complainant, *pro rata*, in proportion to the amount of principal and interest due to said certificate holders respectively; that the said referee bring the surplus moneys arising from the said sale, if any there shall be, into court within twenty days after the same be received, to be there subject to the order of the court ; that the said referee make a report of such sale, and file the same with the clerk of this court with all convenient speed; that if the proceeds of such sale be insufficient to pay the amount due to the complainant as aforesaid, with interest and costs as aforesaid, and also to pay the other certificate holders the amount due to

them respectively, as may be ascertained by said master as aforesaid, the said referee specify the amount of such deficiency in his report of sale, and that the defendants Rowland N. Hazard and William Foster, Jr., pay to the complainant, and to the other of said certificate holders, the residue of the indebtedness on said certificates remaining unsatisfied after the sale of said property and the application of the proceeds pursuant to the directions contained herein; and that the complainant and the other of said certificate holders, to be ascertained as aforesaid, have execution thereof; and that the purchaser or purchasers at such sale be let into possession on the production of the said referee's deed and a certified copy of the order or decree confirming the said referee's report of sale.

"And it is further ordered, adjudged and decreed that the defendants and all persons claiming under them, or any or either of them, after the filing of the notice of pendency of this suit, be forever barred and foreclosed of all right, title, interest and equity of redemption in the said premises so sold or any part thereof.  The following is a description of the premises and property hereinbefore referred to and thereby directed to be sold, as contained in a certain mortgage made by the said the Lebanon Springs Railroad Company to the Union Trust Company, and which were conveyed by the deed executed by George McClellan, referee, to the defendants William Foster, Jr., and Rowland N. Hazard, referred to in the bill of complaint herein.

[Description.]

"Leave is hereby reserved to the complainant and to the other certificate holders above referred to, or any of them, to apply upon the foot of this decree for the appointment of a receiver to take immediate possession of the property above described, and to keep the same until the sale under this decree shall be consummated by the delivery to the purchaser or purchasers at such sale of a referee's deed or deeds, and to deliver the property so sold to such purchaser or purchasers, with the powers usually possessed by receivers in such cases."

Subsequently, in pursuance of the decree, the holders of the

certificates appeared before the special master and made proof of their ownership thereof, and said master, on February 7, 1888, made a report accordingly, finding the names of the holders thereof and the amounts due them respectively.

On March 23, 1892, in pursuance of an order of sale made by the said Circuit Court of the United States, Worthington Frothingham, as referee, sold the said premises and property described in the complaint (and described in the deed of George McClellan, referee, to Foster and Hazard) to William Foster, Jr., for the sum of seventy-five hundred dollars, and on April 25, 1892, executed and delivered a deed therefor to the said William Foster, Jr.

On December 8, 1890, Aaron R. Stevens, Harper W. Rogers, Nancy E. Wilbur, Andrew A. Douglas, as trustee under the will of W. H. Douglas, deceased, and Ida S. Harrison, for themselves and other holders and owners of bonds issued by the Lebanon Springs Company and the Harlem Extension Railroad Company, filed a petition or bill of complaint in the Supreme Court of New York against the Union Trust Company of New York, James C. Hull, William Butler Duncan, John G. McCullough, as administrator of the goods, chattels and credits of Trenor W. Park, deceased; the New York, Boston and Montreal Railway Company, Jesse Seligman, John Crosby Brown, William Watts Sherman, Daniel Butterfield, as receiver of the property of the New York, Boston and Montreal Railway Company; Marvin Sackett, Russell C. Root, the Harlem Extension Railroad South Coal Transportation Company, the Central National Bank of Boston, Peter Butler, as receiver of the property of the Pacific National Bank of Boston; the Massachusetts Mutual Life Insurance Company, and others.

In this petition there is a history of the Lebanon Springs Railroad Company and the Harlem Extension Railroad Company, and of the several legal proceedings whereby the roads, property and franchises of these companies became vested in the New York, Rutland and Montreal Railway Company, which is substantially the same with that heretofore made in this statement. But the petition assailed the action brought

by Sackett in 1880, and which resulted in the sale to Foster and Hazard in 1885, as fraudulent and collusive, and alleged that "the suit by Sackett was brought and conducted, not with the intention of realizing the said property for the benefit of the bondholders or any of them, or of himself as bondholder, but collusively and with the intent that he and others should receive large sums of money from the said property under color of the payment of claims, which, even if valid, were subordinate to said mortgages, and with the intent that said railroad and property should be acquired by others free from the lien of said mortgages, and without realizing anything to the holders of said bonds."

The petition further alleged that "afterwards the defendant, the Central National Bank of Boston, claiming to own such certificates to the amount of two hundred and fifty thousand dollars, stated at par of the principal of the same, brought an action in this court against the defendants Foster and Hazard, the New York, Rutland and Montreal Railway Company, and the American Loan and Trust Company; that in that action the plaintiff prayed for the sale of the said railroad and property for the satisfaction of the certificates; that said action was removed into the Circuit Court of the United States, and such proceedings have been had therein that a decree has passed whereby it is provided that the said railroad and property be sold by a master of that court for the payment of the said certificates."

The prayers for relief were as follows:

"1. That it may be adjudged that the owners of the bonds issued by the Lebanon Springs Railroad Company have a first lien upon the said railroad and property, and the owners of the bonds issued by the Harlem Extension Railroad Company a second lien thereon, in preference of all others. That the bond and mortgage executed by the defendants Hull and Lincoln to the defendant Duncan and the said Park is held for the benefit of the owners of said bonds and represents their interest solely, and that defendants Brown and Seligman redeliver the same.

"2. That the judgment in the action brought in this court

by the defendant the Union Trust Company, and the decrees in the two actions brought by that company in the Court of Chancery of Vermont, be now specifically enforced, and the mortgage by the said Hull and Lincoln be now foreclosed, and that the said railroad and property be sold under said judgments and decrees, and said mortgage of Hull and Lincoln, for the benefit of this plaintiff and all other of the owners of the Lebanon Springs and Harlem extension bonds, and that all of the defendants. in this action be barred and foreclosed of all right, title, interest and equity of redemption, of, in and to the said railroad and property and any part of the same.

" 3. That it may be adjudged that the certificates issued by the said Van Valkenburgh were beyond the power of this court to issue and are of no validity except to bind the interest represented by the eight bonds of the said Marvin Sackett, and the interests of the defendants in the action brought by said Sackett.

" 4. That all of the defendants in this action and all other persons be enjoined, as well temporarily by order as permanently by judgment, from interfering with any part of the said railroad or property.

" 5. That a receiver be appointed, with the usual powers of receivers, to take possession of, preserve and operate said railroad and property until further order of the court.

" 6. That the plaintiffs have such other and further relief as to the court shall seem just, besides costs."

To this petition the Central National Bank of Boston filed its separate answer, in which, after admitting certain allegations in the petition, relative to the history of the railroad companies, the said defendant set forth the proceedings in the suit of Sackett, including the appointment of Van Valkenburgh as receiver, the authority given such receiver by the court to issue and negotiate the said certificates, and the purchase by the defendant of $250,000 of said certificates for full value. The answer further alleged, in response to the petition, that the suit was brought by Sackett for himself as bondholder and on behalf of all other bondholders; that other

bondholders, representing all, or nearly all, the bonds issued by the Lebanon Springs Railroad Company, had knowledge of the pendency of said suit by Sackett, and were represented by attorneys and counsel, although not nominally made parties to the action; that Foster and Hazard became purchasers at the sale, and that, by the terms of the sale, they had assumed the payment of the unpaid portion of said certificates as part of the consideration of the purchase; and further alleged that said judgment of the Supreme Court of New York had never been appealed from, reversed or in any way vacated or modified, and was binding and conclusive, not only upon the parties to said action, but upon the other holders of said bonds issued by the Lebanon Springs Railroad Company. The answer then proceeded to set forth proceedings in the Circuit Court of the United States, including the decree of March 24, 1887, and to pray, among other things, that the petition should be dismissed upon the merits, and that a decree may be rendered recognizing the rights of the defendant the Central National Bank of Boston as a holder of said certificates as such rights had been theretofore established by the decree of the Circuit Court of the United States.

The American Loan and Trust Company filed its separate answer, admitting some and denying other allegations of the petition. Hazard and Foster also filed a separate answer on their own behalf, in which they allege that the Sackett suit was brought and pursued in behalf of all the bondholders; that they, Foster and Hazard, had purchased the railroad property and franchises in good faith, and that by the judgment, decree and sale in said suit, all the rights of said bondholders, plaintiffs in this suit, were cut off and barred, and that they, Foster and Hazard, had thereby acquired a good and valid title to said property and franchises, and thereupon they prayed that the complaint be dismissed and that a decree be rendered establishing their rights as purchasers of said road under said judgment and decree.

The New York, Rutland and Montreal Railway Company likewise filed a separate answer, denying the principal allegations of the petition, and praying that the rights of said com-

pany as purchaser of said road from Foster and Hazard should be confirmed, and that the complaint be dismissed.

Certain other individual defendants, holders of receiver's certificates, likewise answered, denying these allegations of the petition which assailed the validity of the proceedings in the Sackett suit, and praying that the said petition should be dismissed. Separate answers were likewise filed by Seligman and Brown, and by William B. Duncan substantially to the same effect.

Upon the first trial of this action judgment was rendered in favor of the defendants, dismissing it on the merits. On appeal that judgment was reversed by the general term and a new trial ordered. *Stevens* v. *Union Trust Co.*, 57 Hun, 498.

At the new trial judgment was rendered in favor of the plaintiffs on November 10, 1891, and this judgment, having been affirmed by the general term, was taken on appeal to the Court of Appeals, whose judgment, rendered November 27, 1894, affirmed that of the court below. *Stevens* v. *Central Nat. Bank*, 144 N. Y. 50. This writ of error was then sued out.

Upon sale made by John L. Henning, as referee, under the judgment of the Supreme Court in this case, pending the appeals, there was executed and delivered to said William Foster, Jr., by said referee a deed of conveyance of the railroad, property and franchises, dated May 16, 1892; and, as already stated, on March 23, 1892, the railroad was sold and conveyed to William Foster, Jr., by the referee appointed by the decree of the United States court.

After the judgment of November 10, 1891, William Foster, Jr., brought an action in the Supreme Court of New York against the Central National Bank and other holders of certificates, seeking to set aside that portion of the decree of the United States Circuit Court of March 24, 1887, which adjudged that Foster, either alone or with Hazard, pay the Central Bank and other certificate holders the deficiency that might exist in the payment of the certificates after the application of the proceeds of the sale of the road, and to annul and enjoin the decree that execution issue for such deficiency; and that this action, so brought by Foster, has been removed, on

the petition of the Central National Bank, to the Circuit Court of the United States for the Northern District of New York, where it is now pending.

*Mr. Charles E. Patterson* and *Mr. W. S. B. Hopkins* for plaintiffs in error.   *Mr. Alpheus T. Bulkeley* was on *Mr. Patterson's* brief, and *Mr. William A. Sargent* was on *Mr. Hopkins'* brief.   *Mr. Matthew Hale* and *Mr. Henry D. Hyde* filed a brief for plaintiffs in error.

*Mr. Edward Winslow Paige* for defendants in error.

Mr. JUSTICE SHIRAS, after stating the case, delivered the opinion of the court.

The plaintiffs in error ask us to reverse the decree of the Court of Appeals, affirming that of the Supreme Court of New York, because the action of Stevens and others as a bill of review, or a bill in the nature of a bill of review, was not brought within the time limited by the practice of the courts for entertaining such bills; that, under the Code of Civil Procedure of the State of New York, bills for review have no place for errors appearing upon the face of the record; that the only remedy for such errors is by appeal; that, in so far as it is contended that the decree in the *Sackett case* was obtained by a fraudulent assertion or suppression of facts, the party aggrieved must move promptly upon the discovery of the fraud or of new facts; that the bill and the evidence adduced to sustain it do not disclose such a case of fraud or of newly discovered evidence, but do show a case free from actual fraud, and only, at the most, irregular by reason of a failure to include all the proper parties; that the parties complainant are to be visited with a knowledge of the proceedings in the Sackett suit by reason of the protracted and notorious character of the proceedings, and because knowledge of the proceedings in the Sackett suit must further be imputed to them, because they are represented in the effort to impugn the validity of that decree by counsel who had appeared for Sackett in his suit; and that hence the present suit should, on the well-estab-

lished rules regulating bills of review and bills to impeach decrees on the ground of after-discovered evidence, have been dismissed.

Without expressing any opinion on such allegations of error, it is sufficient to say that they raised questions for the consideration of the Court of Appeals of the State of New York, and that the disposition made of them by that court is binding upon us.

But those assignments of error which allege that the judgment of the Supreme Court of the State of New York, and of the Court of Appeals in affirming it erred in failing to give proper effect to the decree of the Circuit Court of the United States, and in granting a final injunction restraining the appellants from availing themselves of the provisions of such decree, certainly do present questions which are within our jurisdiction to consider.

Referring to the previous somewhat extended statement of the facts, we may briefly recapitulate a few of the principal dates. In August, 1880, Marvin Sackett brought his suit in the Supreme Court of the State of New York, on behalf of himself and all other holders and owners of bonds of certain railroad companies against Root, the Harlem Extension Railroad South Coal Transportation Company, the New York, Boston and Montreal Railway Company and David Butterfield, receiver of said company, praying for the appointment of a receiver and for a sale of the railroad and franchises for the benefit of the bondholders. On October 11, 1880, a receiver was appointed and qualified.

On April 2, 1881, on petition of the receiver, and after a report by an expert disclosing the necessity for expenditure to make the road safe and to enable trains to be run, an order was made by the court authorizing the receiver to issue and negotiate $350,000 in certificates, the same to be a first lien. The certificates were sold, and the proceeds expended under the approval of the court. On June 12, 1885, sale was made of the road and deed delivered to Foster and Hazard for $155,000, subject to the payment of the unpaid portion of the principal and interest of the certificates.

On April 9, 1886, the Central National Bank of Boston brought suit in the Supreme Court of New York, on its own behalf and that of others as owners of the certificates, against Foster, Hazard, the New York, Rutland and Montreal Railway Company and the American Loan and Trust Company. On March 24, 1887, the suit having been transferred on the petition of the defendants to the Circuit Court of the United States, after full hearing and argument the latter court rendered a final decree, establishing the rights of the Central National Bank of Boston and of others as owners of said certificates, declaring the latter to be a first lien, decreeing that Foster and Hazard were liable for any deficiency if sale should fail to realize enough to pay certificates. On March 23, 1892, sale under said decree to Foster for $7500, and on April 25, 1892, deed of conveyance by referee to Foster. On December 8, 1890, Stevens and others brought their suit in the Supreme Court of New York against the Central National Bank of Boston, the other holders of certificates, Foster, Hazard and others, to set aside decree in case of Sackett and to enjoin proceedings in the Circuit Court of the United States. On November 11, 1891, judgment setting aside sale in the case of Sackett and finally enjoining the Central National Bank of Boston and others, plaintiffs in the Circuit Court of the United States, from selling under the decree of the Federal court.

On May 16, 1892, sale and conveyance were made by referee under the decree in the present suit to Foster. On May 9, 1893, judgment of the general term, and November 27, 1894, judgment of the Court of Appeals was rendered, affirming the judgment of the Supreme Court.

It will be perceived, on an inspection of these dates, that when the present suit was brought a final judgment had been rendered in the Circuit Court of the United States, establishing the title and rights of the holders of the certificates, directing a sale by a referee, and adjudging the personal liability of Foster and Hazard for an unpaid portion of said certificates after the application of the proceeds of sale ; that when the judgment of the Supreme Court was entered in the present

case, and without awaiting the result of the appeal to the
Court of Appeals, a sale was had in which Foster became the
purchaser on a bid of $7500; and that Foster was likewise
the purchaser at the sale on the decree of the Circuit Court.

The record does not disclose what application was made of
the purchase money paid by Foster on his respective purchases
at the two sales, but it may be easily conjectured that, after
the payment of the costs and of the expenses of the sales, little
or nothing would be left applicable to the bonds and certifi-
cates.   Thus the singular result, thus far reached, of this pro-
tracted and expensive litigation, is that Foster, who had with
Hazard been the purchaser at the Sackett sale, has become the
owner of the railroad upon the payment of a merely nominal
sum, and that the bondholders and the owners of the certifi-
cates have realized nothing.   And it further thus appears that
ever since May 16, 1892, the controversy has really been be-
tween the holders of the receiver's certificates and Foster who
has, for a trifling sum, become the owner of the railroad as
improved by money procured by the sale of the certificates.

It may be that Foster, when he bought under the decree of
sale in the present suit, did so in pursuance of some arrange-
ment with the bondholders and as their trustee.   But whether
Foster, when he bought under the decree of the Circuit Court
of the United States, subjected himself to that feature of the
decree that made him personally liable for the unpaid portion
of the certificates, and precluded himself from relying on
the decree of the Supreme Court of New York setting aside
the Sackett sale, and whether the setting aside the sale in the
Sackett suit would invalidate receiver's certificates issued years
before and whose proceeds had gone into the improvement of
the property, and whether, in case of Foster's inability to re-
spond to his personal obligation, the unpaid portion of the
certificates would be a lien on the railroad in his hands and
those of his vendees, are questions for the Circuit Court of the
United States, which cannot be withdrawn from its determina-
tion by the subsequent proceedings in the Supreme Court of
New York.   Any confusion that might otherwise have arisen
by reason of conflicting views between the Federal and state

courts has been prevented by the fact that Foster, who himself originally invoked the jurisdiction of the Circuit Court of the United States, has become the purchaser of the railroad under the decrees of both courts, whereby the only substantial controversy that remains is between him, as such purchaser, and the holders of the certificates.

Those portions of the decree of the Supreme Court of New York and of the Court of Appeals which sought to compel the complainants in the suit pending in the Circuit Court of the United States to come into the state court and to there relitigate their titles to the certificates and the amounts thereof, and which sought to restrain them by injunction from proceeding under the final decree of sale of the Circuit Court, and from enforcing the other remedies adjudged to them by that decree, were, in our opinion, erroneous. Due effect was not thereby given to the judgment or decree of the Circuit Court, at least in so far as that decree had established the ownership and amounts of the certificates, and the injunction was a plain interference with the proceedings in another court which had full and complete jurisdiction over the parties and the subject-matter of the suit, and which jurisdiction had attached long before the suit in the Supreme Court had been begun.

It will suffice to cite a few of the cases:

"It is a doctrine of law too long established to require a citation of authorities, that, where a court has jurisdiction, it has a right to decide every question which occurs in the cause, and whether its decision be correct or otherwise, its judgment, till reversed, is regarded as binding in every other court; and that, where the jurisdiction of a court and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested or taken away by proceedings in another court. These rules have their foundation, not merely in comity, but on necessity. For if one may enjoin, the other may retort by injunction, and thus the parties be without remedy; being liable to a process for contempt in one if they dare to proceed in the other. Neither can one take property from the custody of the other by replevin or any other process, for this would produce a conflict extremely em-

barrassing to the administration of justice. In the case of *Kennedy* v. *The Earl of Cassilis*, Lord Eldon at one time granted an injunction to restrain a party from proceeding in a suit pending in the Court of Sessions of Scotland, which, on more mature reflection, he dissolved; because it was admitted, if the Court of Chancery could in that way restrain proceedings in an independent foreign tribunal, the Court of Sessions might equally enjoin the parties from proceeding in chancery, and thus they would be unable to proceed in either court. The fact, therefore, that an injunction issues only to the parties before the court and not to the court, is no evasion of the difficulties that are the necessary result of an attempt to exercise that power over a party who is a litigant in another and independent forum." *Peck* v. *Jenness*, per Mr. Justice Grier, 7 How. 612, 624.

"State courts are exempt from all interference by the Federal tribunals, but they are destitute of all power to restrain either the process or proceedings in the national courts. Circuit Courts and state courts act separately and independently of each other, and in their respective spheres of action the process issued by the one is as far beyond the reach of the other as if the line of division between them 'was traced by landmarks and monuments visible to the eye.' Appellate relations exist in a class of cases between the state courts and this court, but there are no such relations between the state courts and the Circuit Courts. Viewed in any light, therefore, it is obvious that the injunction of a state court is inoperative to control, or in any manner to affect, the process or proceedings of a Circuit Court, not on account of any paramount jurisdiction in the latter courts, but because in their sphere of action Circuit Courts are wholly independent of the state tribunals." *Riggs* v. *Johnson County*, 6 Wall. 166.

Whether due effect has been given by a state court to a judgment or decree of a court of the United States is a Federal question within the jurisdiction of this court, on a writ of error to the Supreme Court of the State. *Crescent City Live Stock Co.* v. *Butchers' Union*, 120 U. S. 141.

The exemption of the authority of the courts of the United

States from interference by legislative or judicial action of the States is essential to their independence and efficiency.  *Freeman* v. *Howe*, 24 How. 450; *Buck* v. *Colbath*, 3 Wall. 334; *Rio Grande Railroad* v. *Gomila*, 132 U. S. 478.

In Story's Equity Jurisprudence, vol. 2, § 900, it is said, referring to the power sometimes exercised by courts of equity, to restrain parties within their jurisdiction from proceeding in foreign courts: "There is one exception to this doctrine which has been long recognized in America, and that is, that state courts cannot enjoin proceedings in the courts of the United States; nor the latter in the former courts."

It is contended by the counsel for the defendants in error, in a supplemental brief that these principles, so long and so well settled, have been modified by some recent decisions of this court and the case of *Moran* v. *Sturges*, 154 U. S. 256, and of *Shields* v. *Coleman*, 157 U. S. 168, are cited in support of that contention.   Such a conception of the import of those cases must have been formed from a hasty reading, for they are in perfect harmony with the previous cases, and, indeed, may properly be cited to sustain the reasoning upon which those cases proceeded.

In *Moran* v. *Sturges*, the Chief Justice, delivering the opinion of the court, cited the cases hereinbefore referred to and others, and stated the general rule to be that state courts cannot enjoin proceedings in the courts of the United States. In that case the Supreme Court of the State of New York had issued process against certain libellants in the District Court of the United States, and had, after hearing, enjoined them from taking any further proceedings on their libels. This judgment of the Supreme Court being affirmed by the Court of Appeals, and the judgment of the latter court being remitted to the Supreme Court and entered there as its judgment, the libellants sued out a writ of error to this court, and it was here held that the state court had no jurisdiction *in personam* over the libellants as holders of maritime liens when the libels were filed; that the question of jurisdiction was one for the District Court to decide in the first instance; that the District Court had jurisdiction; and that the judgment under

review was in effect an unlawful interference with the proceedings in that court.

It is true, as the report of the case shows, that two of the judges dissented, but not because of any disapproval of the principles laid down by the court, but because it was thought that the possession of the vessels in question had vested in the state court before the libels were filed in the District Court.

In *Shields* v. *Coleman* there was a controversy for possession of certain railroad property, and it was held that a Circuit Court of the United States has not the power to appoint a receiver of property already in the possession of a receiver duly and previously appointed by a state court, and cannot rightfully take the property out of the hands of the receiver so appointed by the state court. Such a decision, it is scarcely necessary to say, gives no support to the contention of the appellees.

The reasoning of the Court of Appeals, affirming the judgment of the Supreme Court of New York, does not seem to us to comport with the law as established by the decisions of this court. It is claimed by the learned judge, who delivered the opinion of that court, that the rule is that "although the courts of one country have no authority to stay proceedings in the courts of another, they have undoubted authority to control all persons and things within their own territorial limits. When, therefore, both parties to a suit in a foreign country are residents within the territorial limits of another country, the courts of equity in the latter may act *in personam* upon those parties and direct them, by injunction, to proceed no further in such suit. In such a case these courts act upon acknowledged principles of public law in regard to jurisdiction. They do not pretend to direct or control the foreign court, but, without regard to the situation of the subject-matter of the dispute, they consider the equities between the parties, and decree *in personam* according to those equities and enforce obedience to their decrees by process *in personam.*"

This language is quoted from Story's Eq. Jur. § 899; but

the learned judge overlooked the passage immediately following, and hereinbefore quoted : "There is one exception to this doctrine which has been long recognized in America, and that is that the state courts cannot enjoin proceedings in the courts of the United States, nor the latter in the former courts. This exception proceeds upon peculiar grounds of municipal and constitutional law, the respective courts being entirely competent to administer full relief in the suits pending therein." Nor did the decision of this court in *Peck* v. *Jenness*, already cited, receive attention, wherein it was said, after adverting to the proposed distinction between enjoining a court and enjoining suitors therein, " The fact that an injunction issues only to the parties before the court and not to the court is no evasion of the difficulties that are the necessary result of an attempt to exercise that power over a party who is a litigant in another and independent forum."

Nor are we able to acquiesce in the reasoning of the learned judge when he says that " the setting aside of the judgment in the Sackett suit upon which the suit in the United States Circuit Court was founded, for fraud, was a *new fact*, occurring since the decree in that court, which gave jurisdiction in this action to enjoin proceedings thereon." Doubtless there may be facts occurring after the rendition of a judgment which would render its enforcement inequitable ; such, for instance, as payment, or a reversal thereof on appeal by a superior court. But surely a judgment and injunction rendered subsequently in another and independent forum cannot constitute such new facts unless we are prepared to concede that, as between two courts of concurrent jurisdiction, it is the judgment of the court whose jurisdiction is *last* invoked which shall be entitled to prevail. This view does not overlook the decision of this court in *Marshall* v. *Holmes*, 141 U. S. 589, where it was held that a Circuit Court of the United States, in the exercise of its equity powers, and where diverse citizenship gives jurisdiction over the parties, may deprive a party of the benefit of a judgment fraudulently obtained by him in a state court, if the circumstances are such as would authorize relief by a Federal court if the judgment had been rendered

by it and not by a state court.    There the suit to restrain
the owner of the judgment from enforcing it was brought in
the state court that had rendered the judgment, and was re-
moved into the Federal court on the ground of diverse citizen-
ship, and it was sought to impeach the judgment for the fraud
of the party who procured it.    In the present case, no fraud of
any kind is imputed to the plaintiffs in the Circuit Court of
the United States, nor is it alleged that the action or proceed-
ings in that court were founded in any mistake of facts, or
were influenced by any misrepresentation or fraud practised
upon the court.    But the purpose of this suit was to practi-
cally nullify the proceedings in the Circuit Court, and to
enjoin the suitors therein from pursuing their remedy in that
court, not for any fraud of theirs used in promoting their
cause, but for the alleged fraud of other parties in another
court, and in a case in which these appellants were not
parties.

It is claimed in the brief for the defendants in error that
whatever may be the rule in ordinary cases there is no neces-
sity in the present case for modifying the decree of the state
court, and we are pointed to the statement in the opinion of
the Court of Appeals, that "there is nothing in the judgment
at bar that attacks the jurisdiction of the United States Circuit
Court or questions the legality of its decree."    We must sup-
pose this language to mean that to enjoin the plaintiffs from
proceeding to enforce the decree did not affect the legality or
efficacy of the decree.    Such must have been the meaning of
the learned judge, because he proceeds to assert that "it is
clear, both upon principle and authority, that this power [to
enjoin the certificate holders] did exist, and that the sale
under the decree of the United States court was without force
or effect as to the parties to that suit, as they proceeded in
violation of the injunction contained in the judgment at bar."

But it has been frequently determined by this court that
the jurisdiction of a court is not exhausted by the rendition
of the judgment, but continues until the judgment shall be
satisfied.    Thus it was said in *Riggs* v. *Johnson County*, 6
Wall. 166, that "process subsequent to judgment, is as essen-

tial to jurisdiction as process antecedent, else the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution." And in *Amy* v. *Supervisors*, 11 Wall, 136, it was said : "The two sets of tribunals — state and national — are as independent as they are separate. Neither can impede or arrest any action the other may take, within the limits of its jurisdiction, for the satisfaction of its judgment and decrees."

"An execution is the end of the law. It gives the successful party the fruits of his judgment." *United States* v. *Nourse*, 9 Pet. 8, 28. But it is scarcely necessary to quote authorities to show that to deprive a court of the power to execute its decrees is to essentially impair its jurisdiction. "*Juris effectus in executione consistit.*" Co. Litt. 289.

The conclusions we have reached are that the judgment of the Supreme Court of New York and of the Court of Appeals affirming the same are erroneous in so far as they command the Central National Bank of Boston, the Massachusetts Mutual Life Insurance Company and other holders of the receiver's certificates whose rights, as such holders, were adjudged by the Circuit Court of the United States, to appear before the referee appointed by the Supreme Court in the present case, and which enjoin the Central National Bank of Boston and others, whose rights have been adjudged by the Circuit Court of the United States for the Northern District of New York, from proceeding with the sale under the decree of that court.

*The judgments of the Supreme Court of New York and of the Court of Appeals, in these particulars, are accordingly reversed, and the cause is remanded to that court for further proceedings not inconsistent with the opinion of this court.*

MR. JUSTICE PECKHAM dissented.