[File No. 6665.]

NORTHERN STATES POWER COMPANY, a Minnesota Corporation, Respondent, v. THE BOARD OF RAILROAD COMMISSIONERS of the State of North Dakota, and Ben C. Larkin, Elmer W. Cart, and S. S. McDonald, the Members of said Board, and the City of Fargo, and the Villages of West Fargo and Southwest Fargo, North Dakota, Appellants.

(298 NW 423.)

4

Opinion filed April 23, 1941.   Dissenting opinion filed May 31, 1941.

*Alvin C. Strutz,* Attorney General, and *James M. Hanley, Jr.,* for appellants.

*Nilles, Oehlert & Nilles* and *Hance H. Cleland,* for respondent.

BURKE, J.   On March 9, 1935, the Board of Railroad Commission-ers (hereinafter referred to as the Commission) ordered an investigation of the properties of the Northern States Power Company (hereinafter referred to as the Company) which were used and useful in providing electric, gas and steam heat service at Fargo, West Fargo and Southwest Fargo, to determine the fair value of those properties for rate making purposes.   The investigation continued for almost three years and the final order of the Commission, establishing a new rate base was made on February 21, 1938.   Separate findings were made for the electric, gas and steam heat departments.   As a result of the investigation the Commission ordered a reduction in the rates of the Company's electric department and an increase in the rates of the steam heat department.   Immediately upon receipt of the Commission's findings and order, the Company petitioned for a reconsideration of the whole case.

The petition was denied and the Company thereupon appealed to the district court of Cass county from all of the findings, decisions and orders of the Commission in this investigation. Pending a decision of the appeal the district court by its order stayed and suspended the order and decision of the Commission, except with respect to the new steam heat rates, and required the Company to deposit in court the difference in charges between the old rates and the rates fixed by the order under attack. The district court's judgment upon the appeal decreed:

1. That the Commission in determining the rate base as set forth in its findings acted arbitrarily and in violation of law.

2. That the Commission erred in refusing to allow as an addition to its valuation of plant equipment the cost of the new steam electric plant at Fargo in the sum of $557,540.

3. That the Commission acted arbitrarily and in disregard of law in refusing to give consideration and effect to "going-concern value" in its valuation of the property of the Company.

4. That the finding of the Commission with respect to operating expenses was not sustained by the evidence and that the Commission unlawfully and arbitrarily failed to make sufficient findings from which the court could determine the reasonableness of its allowances for that purpose.

It was further decreed that the Commission's orders in this investigation, dated February 21, 1938, and March 7, 1938, would result in depriving the Company of its property without due process of law, contrary to the Constitution of the United States and the Constitution of the state of North Dakota; that said orders be vacated and set aside and the moneys representing the difference in charges for electric services deposited in court, pursuant to court order, be returned to the Company, and that the excess charges collected in the steam heat department be returned to the Company's patrons.

A stay of proceedings was granted pending an appeal to this court—and by the terms of this stay the Company was required to continue to deposit in court the excess it collected over and above the rates as fixed by the Commission's order of March 7, 1938. The Commission has appealed to this court from the judgment of the district court.

The first point of controversy concerns the method by which the Com-

mission arrived at its determination of "fair value." The statutory procedure is set forth in § 4609c37 of the Supplement to the Compiled Laws of 1913. This section is as follows:

"Valuation of property; matters considered. The commissioners, for the purpose of ascertaining the reasonableness and justice of the rates and charges of public utilities, or for any other purpose authorized by law, shall investigate and determine the value of the property of every public utility used and useful for the service and convenience of the public, excluding therefrom the value of any franchise or right to own, operate or enjoy the same in excess of the amount (exclusive of any tax or annual charge) actually paid to any political subdivision of the state or county as a consideration for the grant of such franchise or right by reason of a monopoly or merger. The commissioners shall prescribe the details of the inventory of the property of each public utility.

"In ascertaining the value of the various kinds and classes of property of each public utility, the commissioners shall have authority to ascertain and report, in such detail as it may deem necessary, as to each piece of property owned or used by such public utility to show separately the following facts:

"(a) The original cost, if any, of each parcel of land owned and used by such public utility and a statement of the conditions of acquisition, whether by direct purchase, by donation, by exercising the power of eminent domain or otherwise.

"(b) The value, as of a date certain, of each parcel of land owned and used by such public utility by comparison with the value of contiguous and neighboring parcels of land and land of similar character as to location and use.

"(c) If there should be any additional value to such utility by reason of the ownership by it of one or more parcels of land, and it is used as a continuous right of way for transportation purposes, or for other purposes, such additional value shall be separately and specifically set forth for each parcel.

"(d) The cost of new production, as of a date certain, of all physical property other than land, owned and used by such public utility show-

ing the valuation of the separate item comprising such property, together with the unit basis of such valuation.

"(e) Depreciation, if any, from the new reproductive cost, as of a date certain, of existing mechanical deterioration, of age, of obsolescence, of lack of utility or for any other cause, the percentage and amount of each class of depreciation, if any, to be specifically set forth in detail.

"(f) The net value, as of a date certain, of all physical property other than land owned by such public utility, to be derived by deducting the sum of the amounts of depreciation from the sum of the new reproductive costs.

"(g) The value of the property of a public utility company, as determined by the commissioners, shall be such sum as represents, as nearly as can be ascertained, the money honestly and prudently invested in the property. In valuing the property on the basis of the cost to reproduce the same, unit prices of material and labor entering into construction shall be based on the average prices of a sufficient period of years to secure normal results. Equipment shall be valued on the average prices of a sufficient period of years to secure normal results, and there shall be deducted from the total amounts, as thus determined, such sum as is properly chargeable to depreciation under the provisions of subdivision (e), § 37 (this section). The commissioner shall exclude from such valuation all unearned values or unearned increment.

"Such investigation and report shall also show, whenever the commissioners may deem necessary, the amounts and dates and rates of interest of all bonds outstanding against each utility, the property on which they are a lien, the amounts paid therefor and, in such detail as may be necessary the original capital stock and the moneys received by any such utility by reason of any issue of stock, bonds or other securities; the net and gross receipts of such utility; the method by which moneys were expended and the purpose of such payments. The commissioners shall have the power to establish rules and regulations to be followed in making such investigation and valuation."

In the course of its investigation the Commission ascertained historical cost, reproduction cost, and reproduction cost depreciated, of the physical property of each of the several departments operated by the

Company and upon these figures the Commission and the Company are in complete agreement. They are as follows:

Historical Cost as of October 1, 1937—
Electric Department ........................ $1,663,747
Gas Department .......................... 1,097,087
Steam Heat Department ................... 344,958
Reproduction Cost as of October 1, 1937 —
Electric Department ....................... 1,921,751
Gas Department .......................... 1,348,353
Steam Heat Department ................... 422,552

In its findings the Commission did not carry its determination of cost of reproduction less depreciation beyond July 1, 1935. All items of valuation and depreciation necessary to the computation are in the record and are agreed upon by the parties. Making the computation we find reproduction cost less depreciation as of October 1, 1937, to be as follows:

Electric Department ....................... $1,597,957
Gas Department .......................... 1,073,770
Steam Heat Department .................... 335,152

In its determination of the rate base the Commission first found what it denominated as fair value, saying:

"On this question of valuation this Commission has consistently followed the Smyth v. Ames, 169 US 466, 42 L ed 819, 18 S Ct 418, decision, requiring the historical cost and cost of reproduction be considered and given due weight, but adhering to the precedent of this Commission, we feel that the historical cost of the property of this utility should be given greater weight than the cost of reproduction, and in this decision we have weighed them together, giving to each such weight as in our judgment was necessary to arrive at a proper and fair conclusion, considering all of the facts and circumstances disclosed by the evidence, all of which was given due consideration. We find, therefore, based on the evidence adduced, that the fair value of the property is as follows:

Electric Department ....................... $1,750,000
Gas Department .......................... 1,180,000
Steam Heat Department ................... 350,000"

The "fair values," thus found, were not considered by the Commission as the values upon which the computation of the rates was to be made. These basic values were determined by applying depreciation to fair value in the following manner. Using the agreed per cent condition of the physical property of the Company, the Commission computed the accrued per cent depreciation of such property in each of the Company's three departments; it then found accrued depreciation in dollars by applying those percentages to the historical cost of the property and the figures thus ascertained were then deducted from the previous findings of fair value for each department. As a result basic values were found as follows:

| | |
|---|---|
| Electric Department | $1,461,357 |
| Gas Department | 955,510 |
| Steam Heat Department | 277,729 |

The basic value determined for the electric department is thus $202,390 less than historical cost and $136,600 less than reproduction cost depreciated; that for the gas department is $141,577 less than historical cost and $118,260 less than reproduction cost depreciated; and that for the gas department is $77,249 less than historical cost and $57,423 less than reproduction cost depreciated.

The Commission asserted, that in making its findings of value it had followed the decision of the Supreme Court of the United States in Smyth v. Ames, 169 US 466, 42 L ed 819, 18 S Ct 418. In its conclusion that this decision should have been followed, the Commission was correct.

Section 4609c37, supra, is § 37 of chapter 192, Laws of 1919. As originally introduced (H. B. 97) in the Legislature, this section was taken practically verbatim from the Ohio statute which was enacted in 1913 (Code of Ohio), § 499–9. Had the statute been enacted as originally introduced, no difficult question of interpretation would have arisen and the measure of value of a utility's property for rate making purposes would have been established as the reproduction cost of the property of the utility, used and useful for the public service, less actual depreciation. Lima Teleph. & Teleg. Co. v. Public Utilities Commission, 98 Ohio St 110, 120 NE 330, PUR1919A 888 (decided April 30, 1918). However, the proposed statute was amended before final enact-

ment.  Subdivisions (a), (b), (c), (d), (e) and (f) were not changed but subdivision (g) was rewritten.  As originally written subdivision (g) provided:  "If there shall be any additional value given to the value of the property of a public utility due to the possession of a franchise to perform a public service, or for good will or financing, such additional value shall be separately and specifically set forth, together with the basis for the computation or estimate of such additional value."

This language was stricken from the bill and subsection (g) was rewritten as follows:  "The value of the property of a public utility company, as determined by the commissioners, shall be such sum as represents, as nearly as can be ascertained, the money honestly and prudently invested in the property.  In valuing the property on the basis of the cost to reproduce the same, unit prices of material and labor entering into construction shall be based on the average prices of a sufficient period of years to secure normal results.  Equipment shall be valued on the average prices of a sufficient period of years to secure normal results, and there shall be deducted from the total amounts, as thus determined, such sum as is properly chargeable to depreciation under the provisions of subdivision (e), § 37 (this section).  The commissioner shall exclude from such valuation all unearned values or unearned increment."

The situation with which we are confronted then is this:  subsections (a) to (f) inclusive provide for valuation upon the basis of reproduction cost new, as of a date certain, less depreciation; the first sentence of subsection (g) provides for valuation upon the basis of prudent investment and the balance of subsection (g) which is a part of the same amendment, provides for valuation upon reproduction cost new, not as of a date certain but over a sufficient number of years to secure normal results, less depreciation.

Originally the Board of Railroad Commissioners interpreted the statute to direct a finding of fair value for rate-making purposes upon the basis of prudent investment alone.  However, in their decision in the case of the Western Electric Company, decided March 12, 1923, the Commissioners reversed their former holding, saying:  "We agree with counsel for the utility that the tendency of the courts is to hold that the value of the property of a utility must be determined as of the time

of the inquiry. *Further consideration of the statute impels us to the belief that the statute does, in fact, contemplate this very thing."* (italics ours) Re Western Electric Co. (ND) PUR1912C 820, 830.

Since the decision in the Western Electric Company case the Commissioners have consistently followed the rule therein laid down. Re Red River Power Co. (ND) PUR1923E, 534, decided July 6, 1923; Re Mandan Electric Co. (ND) PUR1925D, 508, decided March 11, 1925; Railroad Comrs. v. Hughes Electric Co. (ND) PUR1925A, 18, decided July 30, 1924; Grand Forks v. Red River Power Co. (ND) 8 PUR(NS) 225, decided April 10, 1935. The Commissioners' interpretation of the statute received judicial approval in the case of Grand Forks v. Red River Power Co. which was appealed to the District Court. In the opinion filed in that case, Judge Grimson said: "Two systems of valuations of property are pointed out. One is based on the original cost of the property and is variously designated as historical cost, construction cost or prudent investment cost. The other system is the one which attempts to determine the value of the property if it had to be reproduced at the time of the hearing and is generally called reconstruction value. § 4609c37 of chap. 192, Sessions Laws 1919, directs the Commission to take into consideration both of these systems. That law apparently attempted to direct the Commission to take into consideration all the matters prescribed by the rule laid down in Smyth v. Ames, 169 US 466, 42 L ed 819, 18 S Ct 418, supra." (ND) 12 PUR(NS) 353, 359.

Thus for almost twenty years § 4609c37 has been construed by the Board of Railroad Commissioners as a statutory adoption of the rule of valuation laid down by the Federal Courts commencing with the decision in Smyth v. Ames (ND), supra. Ten Legislative Assemblies have met since the Commission's decision in Re Western Electric Co. (ND) PUR1923C 820, supra, and no amendment has been made of the statute. As was said by Judge Nuessle in State v. Equitable Life Assur. Soc. 68 ND 641, 653, 282 NW 411: "This is pertinent in determining the legislative intent. 'The Legislature is presumed to know the construction of its statutes by the executive departments of the state.' John Hancock Mut. L. Ins. Co. v. Lookingbill, 218 Iowa 373, 253 NW 604."

If it can be reasonably contended that another construction may be placed upon this statute then the statute is of doubtful meaning for no better proof of uncertainty of language can be had than that informed men reasonably and honestly differ as to its meaning. And "in construing a statute of doubtful meaning, the court will give weight to the long-continued practical construction placed thereon by officers charged with the duty of executing and applying the statute" (State v. Equitable Life Assur. Soc., supra) to the judicial construction of such statute by an inferior court (59 CJ 1036) and to the legislative acquiescence in both the departmental and judicial construction. 59 CJ 1037. Whatever doubts we might have had are removed by these considerations and we therefore hold that § 4609c37, supra, adopts the rule of the Federal courts with respect to valuation of utilities for rate making purposes. Many subsequent decisions of both the Federal and state courts which have followed Smyth v. Ames, 169 US 466, 42 L ed 819, 18 S Ct 418, have explained and defined the rule therein laid down and while perhaps no rule has been subjected to more severe judicial and academic criticism, it is apparent that for the time being at least the principles applicable to a determination of value for rate making purposes are well settled.

The value which must be ascertained is the reasonable value of the utility's property used and useful for the public service at the time it is being so used. San Diego Land & Town Co. v. National City, 174 US 739, 43 L ed 1154, 19 S Ct 804; San Diego Land & Town Co. v. Jasper, 189 US 892, 47 L ed 892, 23 S Ct 571; Stanislaus County v. San Joaquin & K. River Canal & Irrig. Co. 192 US 201, 48 L ed 406, 24 S Ct 241; Missouri ex rel. Southwestern Bell Teleph. Co. v. Public Serv. Commission, 262 US 276, 67 L ed 981, 43 S Ct 544, 31 ALR 807; Bluefield Water & Improv. Co. v. Public Serv. Commission, 262 US 679, 67 L ed 1176, 43 S Ct 675. Fair value includes the appreciation in value of the utility's property where the allowance of the appreciation will not produce a rate unjust to the public. Willcox v. Consolidated Gas Co. 212 US 19, 53 L ed 382, 29 S Ct 192, 48 LRA(NS) 1134, 15 Ann Cas 1034; Minnesota Rate Cases (Simpson v. Shepard) 230 US 352, 57 L ed 1511, 33 S Ct 729, 48 LRA(NS) 1151, Ann Cas 1916A 18; McCardle v. Indianapolis Water Co. 272 US 400; 71 L

ed 316, 47 S Ct 144. In the Minnesota Rate Cases the court said: "As the company may not be protected in its actual investment if the value of the property be plainly less, so the making of a just return for the use of the property involves the recognition of its fair value if it be more than it cost. The property is held in private ownership, and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law."

. Among the factors set forth in Smyth v. Ames, as evidence to be considered in the determination of fair value, two have assumed a position of predominating importance. They are historical cost and reproduction cost depreciated. Missouri ex rel. Southwestern Bell Teleph. Co. v. Public Serv. Commission, 262 US 276, 67 L ed 981, 43 S Ct 544, 31 ALR 807, supra; Bluefield Co. v. Public Serv. Commission, 262 US 679, 67 L ed 1176, 43 S Ct 675, supra; Driscoll v. Edison Light & P. Co. 307 US 104, 83 L ed 1134, 59 S Ct 715. But as Mr. Justice Butler said in McArdle v. Indianapolis Water Co. 272 US 400, 71 L ed 316, 47 S Ct 144, supra, "This does not mean that the original cost or the present cost or some figure arbitrarily chosen between the two is to be taken as the measure. The weight to be given to such cost figures and other items and classes of evidence is to be . determined in the light of the facts of the case in hand."

In the instant case the Commission, in finding the rate base considered historical cost depreciated as the controlling factor. In doing so, it did not point to any evidence which it claimed justified denying the Company the benefit of the appreciation in value of its property which was shown in the finding of reproduction cost, depreciated and we find no such evidence in the record. The Commission does not claim that rates based upon a higher valuation than that which was found would be unfair to the consuming public. In fact the·only reason given by the Commission to substantiate its finding of value was that in giving greater weight to historical cost, depreciated, it was "adhering to the precedent of this Commission." It is perfectly clear from what has been said that the establishment of such a precedent is in itself arbitrary. It creates an inflexible formula which denies to the evidence in a particular case its normal probative value. The Commission's adherence to this precedent has had that result in this

case. There is no evidence in the record which impeaches reconstruction cost depreciated as a criterion of fair value to the extent that it should be considered as a factor of minor importance. It is true that fair value and reproduction cost depreciated are not synonymous terms but in the light of the principle that fair value must include the increase in value over original cost, the Commission may not, in fixing fair value, disregard evidence of reproduction cost depreciated or refuse to give such evidence weight as one of the major factors in reaching its conclusions. In the absence of the proof of other circumstances which would tend to destroy its force, such evidence obviously has more bearing on the question of present value, than has evidence of original cost, depreciated, and it was the Commission's duty to give due consideration and effect to that evidence.

It is also contended by the Company that the Commission's refusal to consider the cost of certain new construction as an element of value was arbitrary and illegal. With respect to this item the order of the Commission is as follows: "The next item of proposed addition, . . . consists of the proposed installation of a new 5,000 kilowatt turbine and other necessary additions at a cost of $610,000.00. There was no evidence adduced to indicate the time of this expenditure." In view of our disposition of the previous question this case must be returned to the Commission for reconsideration. It is therefore unnecessary for us to consider whether or not the Commission's action in this regard was justified by the evidence. If, as the Company claims, the addition has been completed and is in use, its value will be allowed by the Commission as a matter of course.

In its computation of a rate base, the Commission refused to add to its finding of the fair value of the physical property of the Company any additional amount for "going concern value." The Company contends that "going concern value" is a very real ascertainable value upon which it is entitled to earn a return and that the Commission's refusal to make such an allowance was contrary to statute and violative of the due process clauses of both the state and Federal Constitutions. Testimony offered on behalf of the Company is that the additional value claimed is "the difference in value between two utilities, one of which has a list of customers, an established business and is in profitable

operation and one which has a plant assembled but without an established business." As concrete evidence of the difference between its own condition and that of a plant fully constructed but not in operation, the Company offered evidence to show, the steady growth of its business and the communities served, its good credit standing, its excellent record in paying its bond interest and preferred stock dividends, its good public relations; that it had a well-trained, competent and loyal staff of employees; and that it had a splendid set of records. Upon this appeal the Commission contends:

(1) That § 4609c37, supra, in its provision that the Commission "shall exclude from such valuation all unearned values or unearned increment," prohibits an allowance of going concern value,

(2) That the evidence offered by the Company is insufficient to establish a going concern value, and

(3) That it gave due consideration and allowance to going concern value.

Before considering the contentions of the Commission it is necessary to set forth certain fundamental principles with respect to going concern value as a factor in valuation for rate making purposes under the Smyth v. Ames rule. The term going concern value in the sense in which it is generally used includes both good will and franchise values, but both of these elements must be excluded from the concept, in computing value for rate making purposes. Cedar Rapids Gas Light Co. v. Cedar Rapids, 223 US 655, 56 L ed 594, 32 S Ct 389; 144 Iowa 426, 120 NW 966, 48 LRA(NS) 1025, 138 Am St Rep 299; Des Moines Gas Co. v. Des Moines, 238 US 153, 59 L ed 1244, 35 S Ct 811, PUR1915D 577. The value which remains after these elements have been extracted, difficult though it may be to define and ascertain, is nevertheless "a property right which should be considered in determining the value of property upon which the owner has a right to make a fair return." Los Angeles Gas & E. Corp. v. Railroad Commission, 289 US 287, 77 L ed 1180, 53 S Ct 637; Des Moines Gas Co. v. Des Moines, 238 US 153, 165, 59 L ed 1244, 1250, 35 S Ct 811, PUR1915D 577; Denver v. Denver Union Water Co. 246 US 178, 62 L ed 649, 38 S Ct 278, PUR1918C 640; McArdle v. Indianapolis Water Co. 272 US 400, 71 L ed 316, 47 S Ct 144, supra. In Los

Angeles Gas & E. Corp. v. Railroad Commission, 289 US 287, 77 L ed 1180, 53 S Ct 637, supra, Chief Justice Hughes said: "The principle thus recognized and limited is obviously difficult of application. . . . It does not give license to mere speculation; it calls for consideration of the history and circumstances of the particular enterprise, and attempts at precise definition have been avoided."

Section 4609c37, supra, was enacted subsequently to the decisions of the Supreme Court of the United States in the Cedar Rapids Case, 223 US 655, 56 L ed 594, 32 S Ct 389, and Des Moines Cases, 238 US 153, 59 L ed 1244, 35 S Ct 811, PUR1915D 577, supra, and it is reasonably subject to the construction that it was the legislative intention to prohibit consideration and allowance by the Commission of any elements of intangible value which those decisions had held were not property values which, in a rate case, were protected by the due process clause of the Fourteenth Amendment. The construction contended for by the Commission which would entirely exclude going concern value from consideration in a rate case would, upon the authorities above cited, render the statute of doubtful constitutionality. Following the well established principle of construction that where a statute is reasonably subject to two constructions one of which is clearly constitutional and the other of which is of doubtful constitutionality the former will be adopted (Wood v. Byrne, 60 ND 1, 232 NW 303; Royal v. Aubol, 69 ND 419, 287 NW 603) we hold that § 4609c37, supra, does not prohibit an allowance of going concern value in valuations for rate making purposes.

The Commission also contends that the investigation disclosed no evidence which would justify the allowance of going concern value as a component part of the rate base. We do not agree. By definition, a utility as an integrated unit with a history of profitable operation has a going concern value. And where the Commission had before it the entire history of the Company showing successful operation over a long period of years it was its duty to consider, determine and give effect to this element of value in establishing the rate base. Los Angeles Gas & E. Corp. v. Railroad Commission, 289 US 287, 77 L ed 1180, 53 S Ct 637; Des Moines Gas Co. v. Des Moines, 238 US 153, 59 L ed 1244, 35 S Ct 811, PUR1915D 577; Denver v. Denver

Union Water Co. 246 US 178, 62 L ed 649, 38 S Ct 278, PUR1918C 640; McAardle v. Indianapolis Water Co. 272 US 400, 71 L ed 316, 47 S Ct 144, supra.

But, the Commission says, it did give consideration and allowance to going concern value. In its findings the Commission asserted that when the property of the company "was appraised by our engineers and those of the Company, the fact that this property was in use and profitable was necessarily considered by them, otherwise certain items of the property would have been depreciated to a greater extent, so that indirectly going concern value was given the consideration to which it was entitled." Neither the findings nor the conclusion are supported by the evidence. The engineers' computations of historical cost and reproduction cost were based upon material and labor costs and certain well established overheads for engineering and other construction expense. Depreciation was computed solely upon the basis of the present physical condition of the property as compared to its original condition. It is true that the engineers did not value the property upon a junk or salvage basis as they would have, had they been asked to value an abandoned plant, but this fact cannot be construed as an allowance of going concern value. Going concern value is not the difference in the value of an abandoned plant and one that is in operation. It is that added value which the plant in profitable operation has over an identical plant which is fully completed and which presently and certainly is to begin operation. Des Moines Gas Co. v. Des Moines, 238 US 153, 59 L ed 1244, 35 S Ct 811, PUR1915D 577, supra; Denver v. Denver Union Water Co. 246 US 178, 62 L ed 649, 38 S Ct 278, PUR1918C 640, supra. Since by the provisions of § 4609c42 Supplement to the Compiled Laws of 1913, the Commission "shall make and file their findings of fact in writing upon all matters . . . which have a bearing on the value of the property of a public utility," a separate finding must be made showing the amount at which the going concern value of the utility has been allowed.

The Company's contentions with respect to the Commission's allowance for expenses remain to be considered. In making this allowance the Commission mentioned specifically only three of the Company's claims and the Company urges that its action upon all three was in

.disregard of the evidence and arbitrary. The first item was the Company's claim of $12,229.60 for regulatory commission expense. The Commission disposed of this claim by stating that it was "non-recurring item of expense and as such will not be considered in projecting expense." The item represents the cost to the Company of the present investigation. Upon this appeal the Commission does not contend that the cost of this investigation should not be projected as an expense item. As stated in the brief, the Commission's position is that the item is nonrecurring as an annual cost and that therefore it should not have been allowed in its full amount as an item of annual expense but should have been apportioned over a period of years. This the Commission claims it did, asserting that it allowed for this purpose $2,500 a year. We think it would have been proper for the Commission to have allowed the investigation cost in this manner but we do not think the Commission's findings sustain its contention that it did so. However new findings made upon a further consideration of this investigation will no doubt clarify the Commission's action.

Next is the item for attorney fees. As to this the Commission said, "No evidence was introduced to justify the entire amount of legal expense amounting to $8,476.01. In our judgment we feel that the sum of $3,000 should be sufficient. . . ." The testimony of the Commission's witness, Hartl, showed in detail the amount spent by the Company for legal services for the year immediately preceding the date of the hearing in this investigation. There is no question but that the Company, during that year spent for legal services the amount it claimed should be allowed annually for legal expense. Of the total amount expended, approximately $5,000 was for regular annual retainer fees. There is no testimony in the record which challenges the prudence or the good faith of the Company's management in the incurring of these charges, nor is there any evidence which indicates that the cost of legal services will be a less sum in the future. It was the duty of the Commission to allow an amount which in its judgment was sufficient for the purpose. In the exercise of that judgment, however, it could not disregard the evidence and substitute for its judgment of the evidence its judgment of what the Company ought to be able to do. The Commission "is not the financial manager

of the corporation and it is not empowered to substitute its judgment for that of the directors of the Company; nor can it ignore items charged by the utility as operating expense unless there is an abuse of discretion in that regard by the corporate officers." State Public Utilities Commission ex rel. Springfield v. Springfield Gas & E. Co. 291 Ill 209, 125 NE 891, PUR1920C 640, quoted with approval in Missouri ex rel. Southwestern Bell Teleph. Co. v. Public Serv. Commission, 262 US 276, 67 L ed 981, 43 S Ct 544, 31 ALR 807. The Commission could not have allowed this item at $3,000 unless it did ignore the evidence of the Company's actual expenditures. The variance between the unchallenged proof and the finding is too great to be accounted for as a reasonable exercise of the Commission's judgment.

The third specific allowance for expense, challenged, is the allowance for dues and donations. The evidence showed that during the year preceding the hearing, the company had spent $4,638.94 for these purposes. As to these expenditures the Commission stated, "some, but not all, of those items are properly chargeable to operating expenses." It did not point out which items it considered improper and concluded by saying "we have allowed as proper charges to operating expenses a total sum of $3,000 for dues and donations for the purposes listed on page 26 of the exhibit mentioned." The exhibit mentioned is the Commission's exhibit "7." The purposes listed on page 26 include all the purposes for which the Company expended $4,638.94. The inconsistency is patent. The finding is that donations for some unstated purposes are not properly allowable as expenses and the allowance is for a reduced sum for all purposes including the unstated improper ones. If the Commission had concluded that some of the donations were improper, it should have pointed them out specifically and if it thought that some of the contributions were so large as to constitute an abuse of discretion on the part of the Company's officers, it should have said so. The action which the Commission did take is simply an attempt to control the discretion of the Company's management. This was in excess of the powers of the Commission. State Pub. Utilities Commission ex rel. Springfield v. Springfield Gas & E. Co. 291 Ill 209, 125 NE 891, PUR1920C 640; Missouri ex rel. Southwestern Bell

Teleph. Co. v. Public Serv. Commission, 262 US 276, 67 L ed 981, 43 S Ct 544, 31 ALR 807.

In its consideration of a general allowance for expenses the Commission stated, "A study of past operations substantiated by the testimony would indicate that an additional 1,400,000 kilowatt hours will have to be generated within the period. Allowance will be made for expense incident to this additional generation. The Company must further provide for a substantial increase in labor costs during the coming year. Allowance is made for such additional expense. Fuel costs have been computed after taking into consideration increased consumption, additional handling charges and comparative costs. As a result of this order income taxes and electric franchise tax will be reduced from the amount estimated in Exhibit 'D' but the entire amount of tax expense will be greater during the next year." This statement was followed by the discussion of regulatory expense, attorney's fees and dues and donations which we have already considered and then the Commission concluded by saying, "After making the above adjustments, we find that the proper operating expenses for each department will be as follows: electric $465,451, gas $193,724 and steam heat $115,093." Later, in its order denying the Company's petition for reconsideration, the Commission increased the allowance for the electric department to $470,005.86.

The Company contends that the allowance for the electric department is $28,000 less than the amount which the evidence demonstrates is clearly required. It also asserts that the Commission has not made sufficient findings upon which to base its allowance and that the failure to make specific findings of fact renders the Commission's procedure arbitrary and illegal.

The Company had claimed for additional expenses over and above the cost of operation for the preceding year the following amounts, increased cost of fuel $22,000, increased labor costs $11,600, increased taxes $17,400. In its findings the Commission referred to these items and stated that some allowance had been made for these increased costs, but it is impossible to tell from the findings the extent to which any single item was allowed or disallowed.

In so far as the record shows, these items may have been allowed in

the full amounts claimed and the reduction accomplished by rejecting items in the previous year's statement of operating costs, or some may have been allowed in full and others in a merely nominal sum. The state of the record is such that it is impossible for us to review the ultimate conclusion of the Commission. We cannot say whether the facts upon which it is founded are supported by any evidence or whether it is one which may reasonably be drawn from the facts.

Section 4609c42 is as follows: "Hearing, right to: evidence on: findings: review of. The public utilities affected shall be entitled to be heard and to introduce evidence at such hearing or hearings. The commissioners are empowered to resort to any other source of information available. The evidence introduced at such hearing shall be reduced to writing and certified under the seal of the commissioners. The commissioners shall make and file their findings of fact in writing upon all matters concerning which evidence shall have been introduced before it which, in its judgment, have a bearing on the value of the property of the public utility. Such findings shall be subject to review by the supreme court of this state in the same manner and within the same time as other orders and decisions of the commissioners."

Specifically this section requires findings only upon those matters which have a bearing upon value. The end of the investigation however is not to establish a value but a rate and it is essential that findings be made upon all matters which have a bearing upon the amount of the rates which the Company will be permitted to charge. Beaumont, S. L. & W. R. Co. v. United States, 282 US 74, 75 L ed 221, 51 S Ct 1. The findings must be sufficiently definite to be reviewed upon appeal; otherwise the right of appeal would be valueless. Chicago R. Co. v. Commerce Commission, 336 Ill 51, 167 NE 840, 67 ALR 938; Chicago Dist. Pipeline Co. v. Illinois Commerce Commission, 361 Ill 296, 197 NE 873; Beaumont, S. L. & W. R. Co. v. United States, 282 US 74, 75 L ed 221, 51 S Ct 1, supra; Wichita R. & Light Co. v. Public Utilities Commission, 260 US 48, 67 L ed 124, 43 S Ct 51.

In the brief submitted by the Commission there appears a tabulation of specific items of expense, showing the amounts at which it is claimed such items were allowed. This tabulation is not sustained by the record and we therefore cannot consider it.

In this investigation there has been practically no dispute as to any material fact. The differences between the Commission and the Company arose chiefly upon the manner in which the Commission weighed the facts and upon the conclusions based upon such facts. In disposing of the issues raised upon this appeal we have not held that the patrons of the Company were not entitled to a reduction in electric rates, nor that the Company was not entitled to an increase in the steam heat rates. It may well be that after a reconsideration of the facts, in the light of this opinion it will be found that the patrons of the Company are entitled to a substantial reduction in electric rates. If that result be reached, then in justice, the consumers were entitled to the reduction as of the date of the Commission's original order.

The case is therefore remanded to the district court with instructions to return the case to the Commission in order to give it an opportunity to reconsider the evidence and to amend its findings and order herein in the light of the rules laid down in this opinion. Such reconsideration shall be had on notice to the Company and additional evidence may be offered by either party. During the pendency of such reconsideration, the district court shall retain jurisdiction of the case and the order requiring the Company to deposit with the clerk of court the excess rates it collects shall remain in force. If the Commission shall amend its order to establish rates, in conformity with this decision, such rates shall be effective as of the date of the first billing subsequent to March 11, 1938, the effective date fixed in the Commission's order of March 7, 1938. Upon the filing of such amended order in the district court, subject to the Company's right to further review, the moneys impounded by the clerk thereof pursuant to the previous orders herein shall be disbursed by direction of the court to the persons who shall be entitled thereto.

The Commission shall have sixty days after the remittitur to the district court, and such additional time as may be allowed by said court for good cause, in which to file its amended order. The failure by the Commission to file such order within the time fixed shall be deemed an election not to reconsider the case and in that event the judgment of the district court shall be affirmed.

Burr, Ch. J., and Nuessle and Morris, JJ., concur.

CHRISTIANSON, J., dissenting. I am unable to agree with the construction that is placed upon § 4609c37 of the 1925 Supplement, in the opinion prepared by Judge Burke. Particularly do I disagree with the construction placed upon the first paragraph of subdivision (g) of said section. This section was part of a comprehensive public utility act enacted by the Legislature in 1919. Laws 1919, chap. 192, § 37. The first paragraph of said subdivision (g) did not appear in the bill as introduced, but was added by amendment. In the bill as introduced, that paragraph read as follows: "(g) If there should be any additional value given to the value of the property of a public utility · or railroad due to the possession of a franchise to perform service or for good will or for financing, such additional value shall be separately and specifically set forth, together with the basis for the computation or estimate of such additional value."

After the second reading of the bill it was referred to the Committee of Labor in the House of Representatives (House Journal 1919, p. 200), and that Committee reported the bill back (House Journal 1919, pp. 325-327), with the recommendation, among others, that the above quoted first paragraph of said subdivision (g) be stricken out and the following (the present paragraph) inserted in lieu thereof: "(g) The value of the property of a public utility company, as determined by the Commissioners, shall be such sum as represents, as nearly as can be ascertained, the money honestly and prudently invested in the property. In valuing the property on the basis of the cost to reproduce the same, unit prices of material and labor entering into construction shall be based on the average prices of a sufficient period of years to secure normal results. Equipment shall be valued on the average prices of a sufficient period of years to secure normal results, and there shall be deducted from the total amounts, as thus determined, such sum as is properly chargeable to depreciation under the provisions of subdivision (e), § 37. The Commissioners shall exclude from such valuation all unearned value or unearned increment."

The recommendations of the Committee were approved, and the bill as amended was passed by the House of Representatives. House Journal 1919, pp. 327, 384.

The Senate proposed no amendments to said subdivision (g) of

§ 37 of the bill. The Senate, however, proposed certain amendments to the provisions relating to procedure on appeal from orders of the Commissioners; and, also, adopted an amendment to § 4 of the bill, striking out an amendment of said section adopted by the House, and inserting in lieu thereof the following provision: "Provided, that when any public utility corporation, company or person operating said public utility shall in any proceeding before the Commission, ask to have its rates raised, above the maximum rate contained in its charter, such public utility shall furnish the Commission, the original cost of all its property, the date of the acquisition of said property, the amount of money invested in said property, the amount of stock outstanding, the amount of bonds outstanding against said property, blueprints showing the location and position of all mains, pole lines, wires, and all other property belonging to the company, and shall furnish the Commission with all books, papers and memoranda of the company showing the financial condition of said utility and shall furnish the Commission with the number of persons in its employ, the salary paid such employees, its total monthly salaries and wage expense for such time as the Commission may request. Also an itemized statement of its expenditures and the details of its profit and loss account and any and all other books, papers, vouchers, accounts which the said Board of Railroad Commissioners shall ask to have produced as evidence at such hearing." Senate Journal, 1919, pp. 484, 486; House Journal, 1919, pp. 621–623. The House concurred in the Senate amendments, and the bill was enacted and became law.

The majority opinion holds that the declaration in the first paragraph of said subdivision (g) of § 37 of the Public Utilities Act to the effect that "the value of the property of a public utility company, as determined by the Commissioners, shall be such sum as represents, as nearly as can be ascertained, the amount of money honestly and prudently invested in the property" is inconsistent with other provisions of the Act and that consequently the Legislature did not intend that the Commissioners, upon ascertainment of the amount of money honestly and prudently invested in the property of a public utility company, should accept this as the measure of present fair value of such property; and, also that the Legislature did not intend that the Com-

missioners, in ascertaining and determining the value of the property of a public utility should give any greater weight to "the amount of money honestly and prudently invested" in such property than to evidence as to the cost of reproduction of such property. The majority opinion also holds that under the Public Utilities Act "a utility plant which has a history of continuous profitable operation over a long period of years has a going concern value;" and "where the evidence shows that a utility had a period of continuous profitable operation, it was the Commission's duty to consider and allow going concern value in determining the fair value of the utility's property;" and, also that it is the duty of the Commission to make *a separate finding* "setting forth the amount at which going concern value has been allowed."

I disagree with such construction of the statute. The language in the first paragraph of subdivision (g), supra, is plain and unambiguous. It in no manner conflicts with any other provision of the Act of which it is a part. It is the only provision that purports to fix the standard or measure of value of the property to be valued. The other subdivisions of said § 37 relate to and provide for the ascertainment of certain facts that the Commissioners may consider in ascertaining and determining the value of the property according to the standard prescribed by the first paragraph of said subdivision (g), but they do not prescribe a standard or measure of value. This paragraph was formulated by the legislative committee to which the bill had been referred for consideration and was embodied in the bill pursuant to the recommendations of such committee, after such recommendations had been considered and discussed by the members of the House in which the bill had originated. House Journal 1919, p. 385. Hence, this paragraph was called specifically to the attention of the Legislature, and was the last expression of the legislative will in so far as concerns the section of which it forms a part. The Senate approved this provision and adopted it without change. The amendment which the Senate proposed and adopted to § 4 of the bill is not contrary to, but is in harmony with, the provisions of the first paragraph of subdivision (g). In the amendment which the Senate adopted to § 4, there is no requirement that a public utility that seeks to have its rates raised above the maximum contained in its charter shall furnish proof of cost of repro-

duction of the property. The information which the utility is required to furnish is material in determining the amount of prudent and honest investment and operating expenses.

Why did the Legislature amend the first paragraph of said subdivision (g)? What object did the lawmakers who proposed and who adopted this paragraph have in mind? Certainly the former paragraph was not stricken out and the present paragraph inserted as a matter of pastime, or to increase the number of words in the statute. The language indicates that the lawmakers had a very definite object in mind. In very plain and specific language they said: "The value of the property of a public utility company, as determined by the Commissioners, shall be such sum as represents, as nearly as can be ascertained, the money honestly and prudently invested in the property." There is no uncertainty or ambiguity in this language. Few statutory provisions are more clear and specific.

The object of all interpretation and construction of statutes is to ascertain and carry out the intention of the lawmakers. 26 Am & Eng Enc Law, 2d ed. p. 597. And "the primary and general rule of statutory construction is that the intention of the lawmaker is to be found in the language that he has used." United States v. Goldenberg, 168 US 95, 102, 103, 42 L ed 394, 398, 18 S Ct 3.

"The legislature must be understood to mean what it has plainly expressed, and this excludes construction. . . . Even when a court is convinced that the legislature really meant and intended something not expressed by the phraseology of the act, it will not deem itself authorized to depart from the plain meaning of language which is free from ambiguity. . . . 'There is no safer or better settled canon of interpretation than that when language is clear and unambiguous it must be held to mean what it plainly expresses.'" 2 Lewis's Sutherland, Statutory Construction, pp. 701, 702. 25 RCL pp. 961–963; 59 CJ 953 et seq.

Courts have no legislative powers, and they may not reject a statutory provision in plain and unambiguous language because it seems unnecessary, or unwise, or requires the performance of acts that appear to the court to be useless. American R. Co. v. Birch, 224 US 547, 56 L ed 879, 32 S Ct 603; United States v. Plowman, 216 US 372,

54 L ed 523, 30 S Ct 299; State ex rel. Linde v. Taylor, 33 ND 76, 156 NW 561, LRA1918B 156, Ann Cas 1918A 583.

It is a cardinal rule of statutory construction that effect must be given, if possible, to the whole statute and to every part thereof. "Conflicting intentions in one and the same act of the legislature are not to be supposed and never so regarded, unless forced on courts by unambiguous language." Marengo County v. Wilcox County, 215 Ala 640, 112 So 243. It is only when there is such irreconcilable conflict between the provisions of the statute that they cannot both or all stand that the court is required to determine which of the conflicting provisions is expressive of the legislative will. It is not enough that there is a discrepancy, or that some of the acts enjoined or authorized by the statute may seem to be useless, or even harmful (Greenleaf v. Minneapolis, St. P. & S. Ste. M. R. Co. 30 ND 112, 119, 120, 151 NW 879, 882, Ann Cas 1917D 908; American R. Co. v. Birch, 224 US 547, 56 L ed 879, 32 S Ct 603, supra; United States v. Plowman, 216 US 372, 54 L ed 523, 30 S Ct 299, supra), "courts would still be bound by the explicit and unmistakable words" of a statutory provision, unless there is an irreconcilable conflict between that provision and other provisions of the same or other statutes. In case of such conflict, the provision last in point of time or order of arrangement is ordinarily deemed to be expressive of the legislative will. 11 Enc U.S. Supreme Court Reports, p. 130; 1 Lewis's, Sutherland Statutory Construction, 2d ed. p. 540, § 280; 26 Am & Eng Enc Law, p. 734; 36 Cyc 1130; note in 6 Ann Cas pp. 860, 861. When one provision of a statute treats specially and solely of a matter, that provision will prevail in reference to that matter over other provisions which either incidentally or impliedly refer thereto, "not because one provision has more force as a legislative enactment than another, but because the legislative mind, having been in one provision directed to this matter, must be presumed to have there expressed its intention thereon rather than in other provisions where its attention was turned to other things." Long v. Culp, 14 Kan 412.

The first paragraph in subdivision (g), § 37, chapter 192, Laws 1919 was the last expression of the lawmakers upon the subject to which it relates. The lawmakers determined that the bill as intro-

duced did not express their intent, and so they amended it and inserted a new provision to express such intent. The provision so inserted covered a matter not covered by any other provision in the bill. When the bill became law it was the only provision which purported to state in terms the basic standard the Commissioners shall apply in determining the value of the property of a public utility. If any conflict exists between the provision that was added by amendment, and the provisions in the bill as introduced, the amendment should be deemed expressive of the legislative will. In this case, however, there is no irreconcilable conflict between the first paragraph of said subdivision (g) and other provisions of the Act. Indeed, there is no conflict at all. The first paragraph of subdivision (g) of said section is the only provision in the entire statute that purports to state the basic value to be ascertained and determined by the Commissioners.

Chapter 192, Laws 1919 was the first comprehensive public utilities are adopted in this state. That there existed a real need for such a law was generally recognized and was freely expressed by the lawmakers. House Journal, 1919, p. 385. It is a matter of common knowledge that in 1919, and for a number of years prior thereto, regulation of public utilities had been a subject of public interest and concern. Public Utilities Acts had been enacted in a number of states prior to 1919. Massachusetts was the first state to exercise control over all public utilities. See 67 L ed p. 994, note 21. Under the law of Massachusetts, as interpreted and applied in 1919 and for some years prior thereto, "capital honestly and prudently invested" was "the controlling factor in fixing the basis for computing fair and reasonable rates." Re Bay State Rate Case (Mass) PUR1916F, pp. 221, 233; Middlesex & Boston Rate Case, 2 Ann Rep Mass PSC pp. 111, 112.

In the Middlesex & Boston Rate Case (decided in 1914), it was said: "Accordingly, we rule that under Massachusetts law capital honestly and prudently invested must, under normal conditions, be taken as the controlling factor in fixing the basis for computing fair and reasonable rates; that if there is mismanagement causing loss, such loss must be charged against the stockholders legally responsible for the mismanagement; that reproduction cost either with or without depreciation,

while it may be considered, is not under our law, to be taken as the determining basis for determining rates." 2 Ann Rep Mass PSC pp. 111, 112.

In Re Bay State Rate Case (Mass) PUR1916F, p. 221 (decided August 31, 1916), the rule laid down in the Middlesex & Boston Rate Case was reaffirmed.

Wisconsin had provided for regulation of public utilities through a State Commission may years before the public utility law was enacted in this state. In discussing the practice under the Wisconsin law, the supreme court of that state in its decision in Waukesha Gas & E. Co. v. Railroad Commission (decided July 1923) 181 Wis 281, 300, 301, 194 NW 846, 854, said:

"For 15 years this statute has been administered upon the theory that the investor was entitled to a reasonable return on a valuation that fairly represents the legitimate and necessary cost of constructing the plant and building up its business. . . . Both the Commission and the court in Wisconsin have adhered with reasonable fidelity to what is now termed the prudent investment theory. . . .

"*In determining the present fair value of a public utility* operating under our public utility law, it is our view that justice as well as sound economic practice requires that *controlling weight should be given in the valuation of the plant of a public utility to the investment cost where the investment has been prudently made.*"

In its decision in Milwaukee Electric R. & Light Co. v. Milwaukee (Wis) PUR1918E, pp. 1, 2 (decided June 1918), the Wisconsin Commission said:

"Fair value may be expressed as the amount which has been prudently and economically invested in the property. This would seem to represent fair dealing, on the one side, as to the public, and a fair measure of the sacrifice of those who have invested their money in the utility.

"On the whole, it would seem that there could be no more equitable standard of fair value as between the utility and the consumer, than that of investment reasonably and prudently made. . . . Under ideal conditions, capitalization might well be the measure of it. But ideal conditions do not always exist. The company may not have

exercised proper foresight or business acumen in the erection of the plant, or the installation of equipment. Through failure to charge off renewals the plant account may be inflated. The amount expended to bring about a consolidation or acquisition of additional property may have borne no relation to the amount legitimately expended to construct the original properties consolidated or acquired. Even if the original cost of the property is ascertainable, it may not be the reasonable measure of the investment. . . .

"In many cases books showing the early history of the enterprise may be entirely lacking. In the case of most larger companies, consolidations have taken place, and original cost can only be estimated at best, or again, if books of account are available, they may not be kept in such manner as to throw much light upon questions of early history, essential to be ascertained in order to get at a fair original cost at the early period of development. . . .

"If the amount honestly and prudently invested in the enterprise could always be ascertained, it would, in our judgment, be a very important element to be considered in establishing fair value, as representing both the measure of sacrifice by the owners of the utility and that amount upon which the public should be asked to pay reasonable returns. The difficulty, however, relates rather to the ascertainment of the facts, than to the matter of definition. It is largely because of the difficulty in ascertaining such an amount that reproduction cost is in so many cases resorted to and given a preponderating influence. We are of the opinion that reproduction cost is useful in proportion as it tends to throw light upon investment, rather than as being in and of itself the measure of exchange value.

"Reproduction cost, both new and less depreciation, is also valuable in other ways. The reproduction estimate is helpful in determining the amount of nonoperating property as distinct from the operating property, and assists in the allocation of a large property between different utilities served by the same organization. . . . Reproduction cost less depreciation tends to throw considerable light on the question of treatment of maintenance and renewals, and is especially important in connection with establishing a proper depreciation reserve and fixing a proper amount to be annually credited to that reserve.

It also throws light on the question of whether depreciation has been allowed to take place at the expense of service. If the company has neglected upkeep or failed to maintain proper reserves, the earnings in the meanwhile being sufficient for that purpose but being in fact returned to the stockholders in the form of dividends, this fact should be ascertained. . . .

"As reproduction cost new is not necessarily to be taken as representing fair value, it seems equally clear that reproduction cost new less depreciation cannot be so taken. *What is to be ascertained is the amount fairly representing the prudent and honest investment made by the owners of the utility. They are entitled to have that contribution kept intact until returned to them.*" PUR1918E pp. 23–26.

During the years immediately preceding the enactment of the Public Utilities Act in this state, utility commissions in other states and eminent legal writers in ever-increasing numbers had approved the amount of prudent and honest investment as the measure of value in computing just and reasonable rates. Edwin C. Goddard, "Public Utility Valuation," 15 Mich L Rev 205, at 226; Robert H. Whitten, "Fair Value for Rate Purposes," 27 Harvard L Rev 419; 1 Whitten, Valuation of Public Service Corporations, 2d ed. pp. 542–547, 575, 586, 591. Prior to the enactment of the Public Utilities Act in 1919, there had been no control by the state of the accounting of the various public utilities that were brought under the regulatory powers of the Commissioners by that Act, and the experiences of other states as well as of the Interstate Commerce Commission had demonstrated that in many, if not most, instances it would be impossible to ascertain the actual or original cost of public utility property from the records of the utility. The experiences in other states had demonstrated that "it was impossible to ascertain with accuracy, in respect to most of the utilities, in most of the states in which rate controversies arose, what it cost in money to establish the utility, or what the money cost with which the utility was established, or what income had been earned by it, or how the income had been expended." (Missouri ex rel. Southwestern Bell Teleph. Co. v. Public Serv. Commission, 262 US 309, 67 L ed 994, 43 S Ct 544, 31 ALR 807). The Interstate Commerce Commission in its decision in the Texas Midland R. Co. Case, 75 Inters

Com Rep p. 1, decided July 31, 1918, had called attention to the difficulty encountered by it in endeavoring to comply with the requirements of the Railroad Valuation Act that the Commission should report "original cost to date." In its decision in that case, the Commission said that its experience indicated that in "most cases it would be impossible to report original, costs to date from accounting records alone."

The lawmakers who enacted the Public Utilities Act of this state in 1919 had the benefit of the experiences of the Interstate Commerce Commission and of the Utility Commissions in other states which had been required to ascertain and determine the value of public utility properties for rate-making purposes. They also had the benefit of the experiences of the Board of Railroad Commissioners in this state under chapter 208, Laws 1915. That law provided that whenever the city council or commission of any city, or the governing body of any town or village should adopt a resolution "complaining that the rate charged within the municipality by any person, firm or corporation furnishing either water, gas or electricity for light, heat or power, to said municipality or to the inhabitants thereof is excessive" the Board of Railroad Commissioners shall fix a time for a hearing on such complaint and upon the completion of such hearing shall make findings of fact and on such findings "shall make an order fixing and establishing a just and reasonable rate as a maximum to be charged for the ensuing five years for the commodity the rate for which is then under investigation." A proceeding had been instituted under this statute involving the properties of the Northern States Power Company in the state of North Dakota, including the properties furnishing electricity, artificial gas and steam heat to the citizens of Fargo. That proceeding was pending when the Public Utilities Act of 1919 was prepared, introduced and adopted, and, by agreement of the parties, the hearing was continued and conducted under the Public Utilities Act of 1919. Fargo v. Union Light, Heat & P. Co. (ND) PUR1920A, pp. 764, 768. According to the decision in that case, the utility properties in Fargo were purchased by the Northern States Power Company on April 1st, 1910, and it appears that although the utility company had been requested to furnish the Commission with a statement of values representing the original costs of each of its properties, the utility

was unable to furnish any reliable statement because the records show-ing the original cost had been lost. It was pointed out in the decision that this was not an exception but the prevailing condition as to public utilities in this state. The Commission said: "The history of the utility companies coming to its (the Commission's) notice has been one of almost continual purchase and sale. The fact that the utilities have changed hands frequently results in a loss of records covering the early years of development. The Commission, therefore, may fre-quently find it unable to secure any reliable information or data covering the original cost of the utility under investigation." (ND) PUR1920A, p. 771.

Upon the hearing in this case one Rice, a valuation engineer of the Northern States Power Company, testified in behalf of the company. He stated that the records of the company as to expenditures and in-vestment in the property prior to 1910 were meager and that such records did not disclose the amount of investment in the utility properties.

The lawmakers who enacted the Public Utilities Act of this state in 1919 realized that as to many public utilities it would be impossible to obtain an accurate account of the original actual cost of utility properties; and that in many instances it would be impossible to estab-lish any satisfactory basis for determining the amount of moneys actu-ally and prudently invested in the utility's properties. So, it was only natural that the lawmakers should provide, as they did, for the various methods of ascertaining value; but notwithstanding this, they very clearly and specifically provided only one controlling standard or measure which the Commissioners should apply in determining present fair value. They said: "The value of the property of a public utility company, as determined by the Commissioners, shall be such sum as represents, as nearly as can be ascertained, the money honestly and prudently invested in the property."

The Act does not require the Commissioners in every case, or in any case, to make investigation or inquiry as to all the subjects enu-merated in § 37 of the Act. It charges the Commissioners with the duty to "investigate and determine the value of the property of every public utility used and useful for the service and convenience of the public." It enumerates certain elements of value that are to be ex-

cluded, and it provides that "in ascertaining the value of the various kinds and classes of property of each public utility, the Commissioners shall have authority to ascertain and report, in such detail as it may. deem necessary, as to each piece of property owned or used by such public utility to show separately" certain enumerated ultimate facts, such as the original cost of land; the value thereof as compared with other neighboring lands of similar character as to location and use; the cost of new production, as of a date certain, of physical property other than land; depreciation, if any, of such physical property, from the new reproductive cost, as of a date certain; and the net value, as of a date certain, of such physical property, derived by deducting the amount of depreciation from new reproductive costs. The scope of the investigation or inquiry is primarily for the Commissioners to determine, and must necessarily depend largely upon the facts in each case. Obviously, the investigation in a case where there are available complete original records and vouchers of all income and outgo will assume a different scope and require different proof from that required in a case where the original records and vouchers are nonexistent, and where, in order to ascertain the original cost, it becomes necessary to establish what probably was paid for the property by showing the prevailing prices for work and materials at the time the property was acquired. 67 L ed p. 988, note 6.

The North Dakota Public Utilities Act was not drawn blindly. Those who prepared and enacted the law had knowledge of similar laws in other states, as well as the difficulties that had arisen in ascertaining the facts pertinent to a determination of the fair value of the property of a public utility. The very terminology of the Act indicates a knowledge of the standard that had been accepted and approved in Massachusetts and elsewhere. The term "honestly and prudently" was not used accidentally. The lawmakers doubtless realized how difficult it would be in many instances for the Commissioners to obtain direct proof of "the money honestly and prudently invested in the property" and so in order that the Commissioners might not be hampered by lack of proof, they specifically authorized the Commissioners to make investigation and obtain proof of such facts as would be likely to aid them in performing their duties under the Act in cases where the best

proof might not be available. The authority to the Commissioners to make such investigation is in no sense inconsistent with the intention of the Legislature so clearly expressed, inserted in the Act by amendment, that "the value of the property of a public utility, as determined by the Commissioners, shall be such sum as represents, as nearly as can be ascertained, the money honestly and prudently invested in the property."

It will be noted that the Wisconsin Commission in its decision in Milwaukee Electric R. & Light Co. v. Milwaukee (Wis) PUR1918E, pp. 1, 2, supra, in seeking to ascertain and determine the amount of "the investment reasonably and prudently made" considered many of the ultimate facts that § 37 of the Public Utilities Act of this state authorizes the Commissioners to ascertain as a basis for a determination as to "the value of the property of a public utility company" measured by "the money honestly and prudently invested." The Wisconsin Commission apparently did not find that the ascertainment of such facts and consideration thereof conflicted with the ascertainment and determination of "the amount which had been prudently and reasonably invested in the property." On the contrary, that Commission deemed such ultimate facts pertinent and material to a determination of "the investment reasonably and prudently made," which it said "is the most equitable standard of fair value for rate making between the utility and the consumer, where such investment may be ascertained."

The "value" that the Commissioners are authorized to determine for rate-making purposes is a special value, and important elements of value that the utility would be entitled to be compensated for in case the state or a political subdivision acquired the property by purchase or condemnation are properly excluded in fixing the rate base. Missouri ex rel. Southwestern Bell Teleph. Co. v. Public Serv. Commission, 262 US 310, 311, 67 L ed 994, 995, 43 S Ct 544, 31 ALR 807.

The Legislature used the term "the money honestly and prudently invested in the property." The investment was not "thus qualified for the purpose of applying an ultra-critical or arbitrary rule which would exclude from the value, investments which, under ordinary circumstances, would be considered reasonable." It was intended to require the Commissioners in determining the rate base to include all expenditures honestly and prudently made in constructing the plant

and in building the business even though subsequent events might show that the investment was not in fact a wise one. For "it may not be possible to avoid adverse conditions and the utility may be entitled to justify charges which at the time the matter is under investigation seem large." Waukesha Gas & E. Co. v. Railroad Commission, 181 Wis p. 301, 194 NW 854. The principal reason for qualifying and limiting the investment to one honestly and prudently made was to exclude from the rate base what might be found to be dishonest or obviously wasteful or imprudent expenditure. 1 Whitten, Valuation of Public Service Corporations, p. 595; 67 L ed p. 986, note 1; Waukesha Gas & E. Co. v. Railroad Commission, 181 Wis p. 301, 194 NW 854.

The Legislature sought to protect the public against rates based on padded values—such as hidden bonuses in security issues, the public payment for the use of property which in reality did not exist, and payment for services which the utility had not rendered. The Legislature, also, sought to safeguard the rights of the public utilities, and to protect them against any invasion or infringement of their constitutional rights. Under the terms of the law, the Commissioners must prescribe reasonable and just rates,—rates which will enable the utility to earn the reasonable cost of performing the service it is performing for the public. Such cost to include not only operating costs, depreciation and taxes, but, also, reasonable and compensatory return on the capital that has been honestly and prudently invested in the plant and business so as to enable the utility to perform the public service that it has undertaken to perform and is performing.

The term "historical cost" is synonymous with "prudent investment;" but is not synonymous with "book cost," "original cost," or "actual cost." 67 L ed p. 988, note 6. See also Galveston Electric Co. v. Galveston, 258 US 388, 391, 66 L ed 678, 681, 42 S Ct 351. So, when the Commissioners stated, in their decision, that they felt historical cost should be given the greater weight in determining the value of public utility property for rate-making purposes, they did not establish an arbitrary standard or take any arbitrary action. They were accepting the standard prescribed by the Legislature. They gave the greater weight to the factor the Legislature had said should be given controlling weight in the determination of the value of the property of a public utility.

In the majority opinion, reliance is placed upon the practical con-

struction, which it is said the Commissioners have placed upon § 37 of the Public Utilities Act. It is true that in construing a statute of doubtful meaning courts will give weight to the *contemporaneous* and *continued* practical construction that has been placed upon such statute by officers charged with the duty of executing and applying it. But here the administrative construction referred to by the majority was "neither contemporaneous nor continuous." Wisconsin C. R. Co. v. United States, 164 US 190, 205, 41 L ed 399, 404, 17 S Ct 45. " 'Contemporaneous construction,' within the meaning of the rule, is the construction which the executive department or officers charged with the enforcement of the statute give to it at or near the time of its enactment." 59 CJ 1029.

The majority ·opinion concedes that the contemporaneous construction that was placed upon § 37 of the Public Utilities Act as to the valuation of properties by the Commissioners charged with the enforcement of the statute *at or near the time of its enactment* was contrary to that now placed upon it in the majority opinion in this case. Nor can it be said that the practical construction which the majority opinion says was initiated by the Commissioners by a decision rendered some four years after the statute was enacted (and contrary to the former and contemporaneous construction) has been uniform and continuous. The decision in this case was rendered in March, 1938. In that decision the Commissioners said: "On this question of valuation this Commission has consistently followed the Smythe v. Ames, 169 US 464, 42 L ed 819, 18 S Ct 418, decision, requiring that historical cost and cost of reproduction be considered and given due weight, but adhering to the precedent of this Commission, we feel that the historical cost of the property of this utility should be given a greater weight than the cost of reproduction, and in this decision we have weighed them together, giving to each such weight as in our judgment was necessary to arrive at a proper and fair conclusion, considering all of the facts and circumstances disclosed by the evidence, all of which were given due consideration."

In the decision in Re Otter Tail Power Co. (ND) 33 PUR(NS) 301 (decided April, 1940), the Commissioners said:

"Subsection (g) of § 4609c37 of the 1925 Supplement provides in part,

" 'The value of the property of a public utility, as determined by the Commission, shall be such sum as represents as nearly as can be ascertained the money honestly and prudently invested in the property.'

"Reading this sentence in conjunction with the entire section, it was, in the opinion of this Commission, the intention of the Legislature to require the greater weight to be given to historical cost in determining the fair value of any public utility. In the opinion of this Commission, such requirement is in keeping with the principles laid down by the Supreme Court in the Smythe v. Ames Case, supra, and is further in keeping with sound principles of utility regulation."

The statement from the Commissioners' decision in Re Western Electric Co. (ND) PUR1923C, 820, 830, quoted in the majority opinion that "the value of the property of a utility must be determined as of the time of the inquiry," did not constitute a reversal of former practice or rulings. Apparently the Commissioners had consistently construed and applied the statute on the theory that the value of the property of a utility must be determined as of the time of the inquiry.

In the decision in Logan v. Bismarck Water Supply Co. (ND) PUR 1923B, 450 (decided Dec. 30, 1922), the Commissioners said: "It is true that in the past the Commission has given considerable importance to, and has largely been influenced by, original cost data, in determining the value of a utility's physical plant for rate-making purposes, whenever this information was available; though in several instances where, by reason of the destruction of the utility's records, the data could not readily be secured, the Commission has not hesitated to apply the cost of reproduction new less depreciation method. *It will be found, however, that the Commission has never been in any doubt regarding the date as of which the valuation was to be determined.* Laying aside the injunction of the statute that certain facts must be ascertained 'as of a date certain,' regardless of what this means, *the Commission has ever attempted to ascertain and determine the value as of the date of the inquiry even though historical costs were considered to have an almost controlling bearing upon this valuation.*" PUR1923B, 476, 477.

The construction that the Commissioners originally placed upon § 37 of the Public Utilities Act and the practice then followed and the construction adopted and the practice following in this case and in Re Otter Tail Power Co. (ND) 33 PUR(NS) 301, supra, were precisely

the construction that had been given to, and the practice that had been followed in administration of, the Public Utilities Act of Wisconsin, according to the statement made by the supreme court of Wisconsin in its decision in Waukesha Gas & E. Co. v. Railroad Commission, 181 Wis p. 301, 194 NW 854, supra: "In determining *the present fair value* of a public utility operating under our public utility law . . . controlling weight should be given in the valuation of the plant to the· investment cost where the investment has been prudently made."

I am fully aware of the decisions of the Supreme Court of the United States expressing disapproval of prudent investment as the sole ground for a rate base, and the repeated approval by that Court of what is known as the rule of Smyth v. Ames. I am also aware of the pronouncements of the same Court upon the question of going value as an element in valuation of utility properties. But, these decisions cannot change the clear words of our statute or authorize the court to do so, and to rewrite it and require the Commissioners to adopt a measure of value different from that which the Legislature has prescribed. Even where a statute contravenes the Constitution, the court may not, under the guise of construction, rewrite it so as to make it conform to the Constitution. To do so would be to legislate, and this "court can only construe. It cannot legislate. Words should not be read into or out of a plain statute. . . . It must be left as written by the legislature."· Rogers-Ruger Co. v. Murray, 115 Wis 267, 91 NW 657, 658, 59 LRA 737, 95 Am St Rep 901; 1 Lewis's Sutherland, Statutory Construction, 2d ed. p. 136.

Notwithstanding the disapproval by the Supreme Court of the United States of the prudent investment theory, some of the states have continued to apply it, and the Supreme Court of the United States has. refused to interfere with rates based upon a valuation reached by ·that method. Los Angeles Gas & E. Corp. v. Railroad Commission, 289 US 287, 77 L ed 1180, 53 S Ct 637; Clark's Ferry Bridge Co. v. Public· Serv. Commission, 291 US 227, 78 L ed 767, 54 S Ct 427.

In Los Angeles Gas & E. Corp. v. Railroad Commission (US) supra,. the State Commission had made its valuation on the basis of prudent investment (West v. Chesapeake & P. Teleph. Co. 295 US at p. 693,. 79 L ed at p. 1658, 55 S Ct 894; (Cal) PUR1931A at p. 137), and also had held that going-concern value, if considered as an independent

item, "should be measured with due regard to the actual cost" as shown in the utility's accounts. (Cal) PUR1931A, p. 151. In the Supreme Court of the United States, it was contended that the erroneous method pursued by the Commission vitiated its order. The Court emphatically rejected that contention, saying: "We do not sit as a board of revision, but to enforce constitutional rights. . . . The legislative discretion implied in the rate-making power necessarily extends to the entire legislative process, embracing the method used in reaching the legislative determination as well as that determination itself. We are not concerned with either, so long as constitutional limitations are not transgressed. When the legislative method is disclosed, it may have a definite bearing upon the validity of the result reached, but the judicial function does not go beyond the decision of the constitutional question. That question is whether the rates as fixed are confiscatory. And upon that question the complainant has the burden of proof and the Court may not interfere with the exercise of the state's authority unless confiscation is clearly established." Los Angeles Gas & E. Corp. v. Railroad Commission, 289 US pp. 304, 305, 77 L ed pp. 1192, 1193, 53 S Ct 637.

In Clark's Ferry Bridge Co. v. Public Service Commission, 291 US 227, 78 L ed 767, 54 S Ct 427, supra, the Court sustained a valuation of the utility's property made by the Public Service Commission upon the basis of the original reasonable cost. In the decision in that case, it was said: "Appellant attacks the finding of fair value upon the grounds that it was based solely on the original cost of the bridge property and that the amount paid by the appellant for the bridge was less than its fair value at the time and less than its fair value in 1930. It is not open to question that the reasonable cost of the bridge is good evidence of its value at the time of construction. And we have said that 'such actual cost will continue fairly well to measure the amount to be attributed to the physical elements of the property so long as there is no change in the level of applicable prices.' " 291 US 234, 78 L ed 771, 54 S Ct 427.

In the Federal Water Power Act, Congress adopted "net investment" as the rate base. 41 Stat. at L. 1063, chap. 285, 16 USCA §§ 796, 799, 813, 807. "Net investment" as defined in the Act "means the actual legitimate original cost" of the project "plus similar costs of additions

thereto and betterments thereof" minus certain items; and in any valuation of the property "for purposes of rate making," no value may be claimed or allowed in excess of the net investment; and the United States is authorized to take over, maintain and operate, any project after the expiration of any license "upon the condition that before taking possession it shall pay the net investment of the licensee in the project or projects taken, not to exceed the fair value of the property taken;" but going value may not be included as a part of the value to be paid for by the government in event it takes the property over or in determining the rate base while the property is being operated by the utility company. 16 USCA §§ 796, 799, 807, 813; Re Safe Harbor Water Power Corp. (ND) 34 PUR(NS) 236. The net investment thus prescribed as a rate base under the Federal Water Power Act is equivalent to prudent and honest investment. Re Safe Harbor Water Power Corp. (ND) 34 PUR(NS) at p. 249.

The Public Utilities Act of this state has carefully safeguarded the constitutional rights of public utility companies. It grants to every utility the right of notice and hearing. The utility may introduce evidence at the hearing; and all evidence introduced must "be reduced to writing and certified under the seal of the Commissioners" (Utilities Act, § 42). The Act provides for a judicial review of the orders of the Commissioners by means of an appeal to the district court, and to this court. The Act provides that "on such appeal the lawfulness of the decision or final order shall be inquired into and determined on the record of the Commissioners as certified to by it." Public Utilities Act, § 35; State ex rel. Hughes v. Milhollan, 50 ND 184, 195, 195 NW 292.

The right of the state to regulate a public utility is as complete as though such right were expressly reserved in the authority granted to the utility to conduct its business within the state. 51 CJ 10; Pond, Public Utilities, § 414. In pursuance of its general power to regulate public utilities, the state has authority to regulate the rates to be charged by the utility for its produce or service. But, the power to regulate a utility and fix its rates is limited by the consideration that the property belongs to the utility and not to the state, and the regulation must not operate to take or damage the property of the utility for public use

without just compensation, to deny to it the equal protection of the laws, or deprive it of its property without due process of law.

"The fixing of rates is a legislative act. In determining the scope of judicial review of that act, there is a distinction between action within the sphere of legislative authority and action which transcends the limits of legislative power. Exercising its rate-making authority, the legislature has a broad discretion. It may exercise that authority directly, or through the agency it creates or appoints to act for that purpose in accordance with appropriate standards. . . . When the legislature appoints an agent to act within that sphere of legislative authority, it may endow the agent with power to make findings of fact which are conclusive, provided the requirements of due process which are specially applicable to such an agency are met, as in according a fair hearing and acting upon evidence and not arbitrarily. . . . In such cases, the judicial inquiry into the facts goes no further than to ascertain whether there is evidence to support the findings, and the question of the weight of the evidence in determining issues of fact lies with the legislative agency acting within its statutory authority.

"But the Constitution fixes limits to the rate-making power by prohibiting the deprivation of property without due process of law or the taking of private property for public use without just compensation." St. Joseph Stock Yards Co. v. United States, 298 US 38, 50, 80 L ed 1033, 1040, 1041, 56 S Ct 720.

I am unable to see any reasonable basis for saying that the state deprives a utility company of its property without due process of law, takes such property for private use without just compensation, or denies to it the equal protection of the laws, when it provides that the utility shall be allowed for the public service that it has undertaken to perform, and to which its property is devoted, all operating expenses; a fair return upon its entire property devoted to public service valued on the basis of all "the money honestly and prudently invested" in such property; and an additional return sufficient to compensate for all depreciation of such property so that "at the end of any given term of years the original investment remains as it was at the beginning," and all additions thereto and betterments thereof that the utility has furnished or paid for remain as they were when they were made.

The majority opinion holds that "where the evidence shows that a utility had a period of continuous profitable operation, it was the Commission's duty to consider and allow going concern value in determining the fair value of the utility's property;" and, also, that in such case, it is the duty of the Commission to make a *separate finding* "setting forth the amount at which going concern value has been allowed." I disagree with this holding. In § 37 of the Public Utilities Act, the lawmakers enumerated certain factors which they said the Commissioners should "have authority to ascertain and report, in such detail as they may deem necessary, as to each piece of property owned or used by such public utility;" but by no stretch of the imagination can "going concern value" be said to be one of the factors so enumerated. Ordinarily, the enumeration in a statute of the things upon which the statute is to operate is deemed to evidence an intention that those not enumerated are to be excluded. 2 Lewis's Sutherland, Statutory Construction, 2d ed. pp. 9116 et seq.; 59 CJ 984. Here the lawmakers enumerated certain factors to be considered by the Commissioners in determining the value of utility property for rate-making purposes, and they said that the Commissioners shall "exclude from such valuation all unearned value or unearned increment."

The Act contemplates that the Commissioners, in ascertaining and determining the value of public utility property for rate-making purposes, shall include everything used and useful for the service and convenience of the public for which the utility has made honest and prudent expenditure; but that the Commissioners shall not include in the valuation which it makes any element or increment of value that was provided by the public without cost to the utility, or that was paid for by the public. Thus, the Act provides that there shall be included in the valuation as determined by the Commissioners whatever sum the utility has "actually paid to any political subdivision of the state or county as a consideration for the grant of (a) franchise or right by reason of a monopoly or merger," but that there shall be excluded from such valuation "the value of any franchise or right to own, operate and enjoy the same in excess of the amount actually paid . . . as a consideration for such franchise or right." Id. § 37 (§ 4609c37, Supp.).

The reason for considering "going concern value" as a distinct ele-

ment in the rate base disappears when "the money honestly and prudently invested" in the property of the utility is given controlling weight in determining present fair value. When honest and prudent investment is adopted as the controlling factor, every item and increment of value that has been contributed or supplied by the utility in the building of its property as a going concern (and for which the utility has not been compensated by the public) is assigned to capital investment, and as such included in the valuation for rate-making purposes; and any item or increment of value that has been contributed by the public and not by the utility may not be included in such valuation, because in such case the value was not brought into being by "the money honestly and prudently invested" by the utility, but by contributions made by the public for public and not for private benefit. Thus, where the cost of attaching new business, setting up and maintaining adequate records, procuring and training a competent staff, and building an efficient organization have been charged to and included in operating revenue and thus actually paid for by the public and not by the utility, there is no valid reason for including such elements in the valuation of the utility property for rate-making purposes. In such case, these elements of value have been paid for by the public and not by the utility, and there would be no more reason for including them in the value fixed as a rate base than to include therein the franchise and the monopoly the utility·enjoys when the same have been provided by the public without cost to the utility. Idaho Power Co. v. Thompson (DC) 19 F(2d) 547, 560. There is no more valid reason for including as an element of value for rate-making purposes under the guise of "going concern value" some item or increment of value that the public has contributed or paid for than to include the amount of cost resulting from depreciation, where the utility has already been compensated for such depreciation by payments made by the public. In either case, the utility would receive a return upon something it has not invested or expended. It would reap from another's sowing. While a utility is entitled to compensation for the depreciation of its property (Knoxville v. Knoxville Water Co. 212 US 1, 53 L ed 371, 29 S Ct 148), it may not, either directly or indirectly, add to or include in its capital investment, the cost of depreciation for which it has been compensated by the public

as a result of rates under which it has been operating. Railroad Commission v. Cumberland Teleph. & Teleg. Co. 212 US 414, 53 L ed 577, 29 S Ct 357. Where the property has been depreciated, and the public have compensated the utility for such depreciation, the "original," "actual," or "prudent and honest investment" has to that extent been lessened, and the present value of the property accordingly decreased.

"Before coming to the question of profit at all the company is entitled to earn a sufficient sum annually to provide not only for current repairs, but for making good the depreciation and replacing the parts of the property when they come to the end of their life. The company is not bound to see its property gradually waste, without making provision out of earnings for its replacement. It is entitled to see that from earnings the value of the property invested is kept unimpaired, so that, at the end of any given term of years, the original investment remains as it was at the beginning." Knoxville v. Knoxville Water Co. (US) supra.

But, a utility company may not take any "part of the money raised to pay for depreciation," and "which it received as a result of rates under which it is operating, and so use it, or any part of it, as to permit the company to add it to its capital account, upon which it is paying dividends to shareholders. If that were allowable, it would be collecting money to pay for depreciation of the property, and, having collected it, to use it in another way, upon which the utility would obtain a return and distribute it to its stockholders." Railroad Commission v. Cumberland Teleph. & Teleg. Co. 212 US 424, 425, 53 L ed 582, 583, 29 S Ct 357, supra.

As stated in the majority opinion, the company as a basis for its demand for allowance of going concern value "offered evidence to show the steady growth of its business and the communities served, its good credit standing, its excellent record in paying its bond interest and preferred stock dividends, its good public relations; that it had a well-trained, competent and loyal staff of employees; and that it had a splendid set of records." Assuming that these are all elements in the value of the utility property, as a going concern, there is nothing to show that any of these elements were brought into being at the expense of the company.

"In this case what may be called the 'inception cost' of the enterprise entering into the establishing of a going concern has long since been incurred. The present company and its predecessors had long carried on business . . . . For aught that appears in this record, these expenses may have been already compensated in rates charged and collected." Des Moines Gas Co. v. Des Moines, 238 US 165, 59 L ed 1250, 35 S Ct 811, PUR1915D, 577.

The principal plants involved in this proceeding were not constructed by the Northern States Power Company, but were acquired by it in 1910 as "established and going concerns." Fargo v. Union Light, Heat & P. Co. (ND) PUR1920A, pp. 764, 781. In a proceeding to determine the reasonableness of rates (decided in September, 1919), the utility sought an allowance for going concern value. The Commissioners refused to allow going concern value. In the decision dealing with this, it is pointed out that the utility plants were purchased and taken over by the Northern States Power Company in 1910. That at that time they were "established and going concerns and undoubtedly were so purchased by the company;" and that "expenses that have been incurred since that date for advertising and soliciting business have been paid out of income and are included, therefore, in operating expense." PUR1920A, p. 781.

In this case the utility asks for an allowance of $250,000 for going concern value. At least part of the allowance so claimed is for cost of establishing and developing business that may have been expended by the "original investors." The principal witness for the utility as to going concern value (the valuation engineer, Rice) in his testimony said:

"As a matter of fact there may have been large quantities of money invested in this property of which we cannot find the records. The records for this company prior to 1910 are meager. I would assume, and I think it is a reasonable assumption, that the original investors did spend large amounts of money in developing this business. Now, I say the investors must have spent it because at the outset of any property and its business there are inadequate returns to cover such development costs. If they were not met by the investors the utility could not have been started."

50

"Q. But you have no specific item which you might be able to cite of that kind, have you?

"A. No, sir, I have not."

In dealing with the question of going concern value, the Commissioners in their decision in this case said: "When this property was appraised by our engineers and those of the company, the fact that this property was in use and profitable was necessarily considered by them, otherwise certain items would have been valued at much less and the property would have been depreciated to a greater extent so that indirectly the so-called going concern value was given the consideration to which it was entitled, but we are unable to agree with the witnesses of the company that, in addition to the consideration which the engineers gave to that property as an element of value because of its profitable use, there should now be added an arbitrary amount of any size. If this property is today worth $250,000 more than its actual physical value because it is in use in a profitable business, this increased value, if in fact it exists, is due, mostly if not totally, to its able management and liberal patronage given to the company by its customers, and this has already been paid for in full by those customers who made that increased value possible. The direct cause of this increased value is the patronage that this company has been favored with, and we can see no reasonable ground why, for the purposes of these proceedings which are exclusively rate making, the patrons of this company should be compelled to pay to the company any return on the patronage which they have granted it and for which they have already paid more than a reasonable compensation, as it must be borne in mind that the records of the Company filed with this Commission show that for many years past the patrons of this utility have paid rates for service far in excess of rates that would have been necessary to bring to the utility a reasonable return on its properties and investments."

(Then follows a table, compiled from the reports of the utility to the Commission, showing the rate of return to the utility before depreciation upon its investment in the electric and gas departments for the period from 1922 to 1936, both inclusive. This table shows a rate of return in the electric department with a high of 33.1 per cent in 1926

and a low of 19.8 per cent in 1936; and in the gas department a high of 21.7 per cent in 1924 and a low of 6.2 per cent in 1936.)

It is not likely that the company has expended moneys contributed by its stockholders in acquiring or training competent and loyal employees. It is more likely that such costs were defrayed out of moneys collected by the company from its customers as operating costs.

"Presumably it pays experienced employees, out of operating revenue, what, in the light of their skill and experience, their service is worth. No contract is shown obligating them to remain, and out of consideration for their training and experience to render service for less than it is worth. . . . Rates to consumers are made to cover the cost, and, with the exception of the early formative period, they have been charged to and paid out of operating revenue, and such increment of value as may accrue is the normal fruitage of such revenue, and not of capital investment." Idaho Power Co. v. Thompson (DC) 19 F(2d) 547, 561.

The good credit standing of the company, and its record for prompt payment of bond interest and preferred stock dividends evidence competent management, but evidence, also, that the company has been allowed sufficient revenue to enable it to meet its obligations.

"Ability to finance the enterprise under just conditions is but a normal attribute of a qualified utility corporation, and cannot be capitalized under the guise of going value. Given its franchise, protected against competition, and permitted to charge rates which will net a reasonable return upon the value of its properties and upon an adequate working capital, it is only doing what is to be expected when it promptly discharges its obligations and thus maintains its credit." Idaho Power Co. v. Thompson (DC) 19 F(2d) at p. 561.